Notice: This opinion is subject to formal revision before publication in the
Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify
the Clerk of any formal errors in order that corrections may be made
before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 9, 2003                         Decided July 11, 2003

No. 02-1055

NEW ENGLAND PUBLIC COMMUNICATIONS COUNCIL, INC.,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

AMERICAN PUBLIC COMMUNICATIONS COUNCIL, ET AL.,
INTERVENORS

———

Consolidated with
02–1091, 02–1092, 02–1105

———

On Petitions for Review of an Order of the
Federal Communications Commission

———

Bills of costs must be filed within 14 days after entry of judgment.
The court looks with disfavor upon motions to file bills of costs out
of time.

*Aaron M. Panner* argued the cause for Bell Operating Company petitioners. With him on the briefs were *Michael K. Kellogg, James G. Garralson, Michael E. Glover, Edward Shakin, John M. Goodman, James D. Ellis* and *Gary L. Phillips*.

*Marcus W. Trathen* argued the cause for petitioners New England Public Communications Council, Inc., et al. With him on the briefs were *Paul C. Besozzi* and *David Kushner*.

*Joel Marcus*, Counsel, Federal Communications Commission, argued the cause for respondent. With him on the brief were *R. Hewitt Pate*, Acting Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, *John A. Rogovin*, Acting General Counsel, Federal Communications Commission, and *John E. Ingle*, Deputy Associate General Counsel. *Lisa E. Boehley*, Counsel, Federal Communications Commission, entered an appearance.

*Robert F. Aldrich* argued the cause for intervenor American Public Communications Council, Inc. With him on the brief was *Albert H. Kramer*.

*Aaron M. Panner* argued the cause for LEC intervenors. With him on the brief were *Michael K. Kellogg, James G. Harralson, Michael E. Glover, Edward Shakin, John M. Goodman, James D. Ellis* and *Gary G. Phillips*. *Peter M. Connolly* entered an appearance.

Before: GINSBURG, *Chief Judge*, and ROGERS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Acting pursuant to a 1996 Telecommunications Act provision designed to promote competition in the payphone service industry, the Federal Communications Commission issued an order requiring the Bell operating

companies (BOCs) to price the service lines used by payphone service providers at forward-looking cost-based rates. In these consolidated cases, two groups of petitioners challenge the order from opposing points of view. One group, composed of BOCs, challenges the Commission's authority to require a specific rate-setting methodology for intrastate payphone lines. The other group, composed of payphone service providers that use non-BOC local exchange carriers' payphone lines, challenges the Commission's decision to limit the forward-looking cost-based methodology requirement to BOCs. Concluding that the Telecommunications Act authorizes the Commission to regulate BOC intrastate payphone line rates, but not those of non-BOC local exchange carriers, we deny the petitions for review and affirm the Commission's order in all respects.

I.

Until the mid–1980s, because payphones could not be operated separately from local exchange service, only local exchange carriers (LECs) provided payphone service. *See Illinois Pub. Telecomms. Ass'n v. FCC*, 117 F.3d 555, 558 (D.C. Cir. 1997) (per curiam). For that reason, the LECs—which, thanks to the 1982 consent decree under which AT&T divested its local exchange carriers, were primarily BOCs, *see United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983)—generally subsidized the cost of payphone equipment and service with revenues from their other services. In the mid–1980s, however, advances in payphone technology enabled independent, non-LEC payphone service providers (PSPs) to enter the payphone market. But because the LECs owned the payphone lines used by all PSPs, they were able to continue to subsidize and otherwise discriminate in favor of their own payphone service. *See generally* In the Matter of Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, 11 F.C.C.R. 6716, 6718–20 ¶¶ 2–6 (1996) (Notice of Proposed Rulemaking).

In the Telecommunications Act of 1996, Congress fundamentally restructured the local telephone industry. Section 276 of the Act, which is specifically aimed at promoting competition in the payphone service industry, prohibits "any Bell operating company that provides payphone service" from subsidizing or discriminating in favor of its own payphone service. 47 U.S.C. § 276(a). It also authorizes the Commission to prescribe regulations consistent with the goal of promoting competition, requiring that the Commission take five specific steps toward that goal. One of these steps is "prescrib[ing] a set of nonstructural safeguards for Bell operating company payphone service" that "shall, at a minimum, include the nonstructural safeguards equal" to those governing BOCs' provision of enhanced services—the so-called *Computer III* safeguards. *Id.* § 276(b)(1)(C). Finally, recognizing that the prescribed regulations would trench on state authority, Congress provided that section 276 preempts state law "[t]o the extent that any State requirements are inconsistent with the Commission's regulations." *Id.* § 276(c).

The Commission implemented section 276 in a series of orders, beginning with the so-called *Payphone Orders.* In the Matter of Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, 11 F.C.C.R. 20541 (1996) (Report and Order) ("*First Payphone Order*"); Order on Reconsideration, 11 F.C.C.R. 21233 (1996) ("*Payphone Reconsideration Order*"). Among other things, these orders require that incumbent LECs provide "individual central office coin transmission services to PSPs" at rates that satisfy the flexible, cost-based "new services test" that developed as an outgrowth of the *Computer III* proceeding. *First Payphone Order*, 11 F.C.C.R at 20614 ¶ 146. Specifically, in an order following the initial *Computer III* order, the Commission directed that service element rates be set at the direct costs of providing the service element, plus "an appropriate level of overhead costs." In the Matter of Amendments of Part 69 of the Commission's Rules Relating to the Creation of Access Charge Subelements for Open Network Architecture Policy and Rules Concerning Rates for Dominant Carriers, 6

F.C.C.R. 4524, 4531 ¶ ¶ 38–41, 44 (1991) (Report and Order and Order on Further Reconsideration and Supplemental Notice of Proposed Rulemaking) ("*Access Charge Subelements Order*"). In the *Payphone Reconsideration Order*, the Commission clarified that while the states, not the Commission, would review the LECs' intrastate payphone line tariffs, the states must ensure that the tariffs are "(1) cost-based; (2) consistent with the requirements of Section 276 with regard, for example, to the removal of subsidies . . .; and (3) nondiscriminatory," and that the states "must apply . . . the Computer III guidelines for tariffing such intrastate services." 11 F.C.C.R. at 21308 ¶ 163.

In 1997, a group of independent PSPs petitioned the Wisconsin Public Service Commission to determine whether Wisconsin LECs' payphone line service tariffs complied with the new services test. The Wisconsin Commission denied the request, finding its jurisdiction under state law limited to "enforcing a prohibition on cross subsidy . . . and prohibitions on discriminatory practices." Letter from Public Service Commission of Wisconsin to Andrew J. Phillips, Yakes, Bauer, Kindt & Phillips (Nov. 6, 1997). The FCC's Common Carrier Bureau, concluding that "[t]he Wisconsin Commission's stated lack of authority to review these payphone service offerings invokes this Commission's obligations under section 276 and the Commission's *Payphone Orders*," directed the four largest Wisconsin LECs to file with the Commission "tariffs for intrastate payphone service offerings . . . together with the supporting documentation . . . necessary to demonstrate compliance with the requirements of section 276 and the Commission's implementing rules." In the Matter of Wisconsin Public Service Commission, 15 F.C.C.R. 9978, 9980 ¶ 5 (2000) (Order) ("*Bureau Order*") (footnotes omitted); *see also* Letter of October 28, 1998, from Kathryn C. Brown, Chief, Common Carrier Bureau, to Hon. Joseph P. Mettner, Chairman, Public Service Commission of Wisconsin, 13 F.C.C.R. 20865, 20865 (1998). The Bureau also notified the LECs that it would examine their tariffs using "an appropriate forward-looking, economic cost methodology" consistent with principles the Commission set forth in its 1996 *Local Competition Order*, in which the Commission implemented

the Telecommunications Act's local telephone market deregulation provisions, 47 U.S.C. §§ 251, 252. *Bureau Order*, 15 F.C.C.R. at 9981 ¶ 9; *see also* In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 F.C.C.R. 15499 (1996) (Report and Order) ("*Local Competition Order*"). In that proceeding, the Commission prescribed a method for setting rates at which incumbent LECs would provide network elements to their competitors based not on the original, historical cost of the equipment used to provide service, but rather on the current cost of providing service using existing equipment. *See Verizon Communications, Inc. v. FCC*, 535 U.S. 467, 495–97 (2002) (upholding the forward-looking cost methodology against the incumbents' challenge).

A coalition of LECs applied for review of the Bureau's order, primarily challenging the Bureau's decision to use forward-looking methodologies in applying the new services test. Citing 47 U.S.C. section 152(b), which provides that "nothing in th[e] Act shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service," the coalition also contested the Commission's jurisdiction to regulate intrastate payphone line rates.

In the order under review in this case, the Commission determined that sections 276(a)(2) and 276(b)(1)(C) establish its jurisdiction to regulate intrastate payphone line rates and thus override section 152(b). It also concluded, however, that its jurisdiction is limited to regulating BOCs' payphone line rates, since those provisions, by their terms, apply only to BOCs, and Congress had not "expressed with the requisite clarity its intention that the Commission exercise jurisdiction over the intrastate payphone prices of non-BOC LECs." In the Matter of Wisconsin Public Service Commission, 17 F.C.C.R. 2051, 2064 ¶ 42 (2002) (Order Directing Filings) ("*Wisconsin Order*"). Finally, the Commission upheld the Bureau's decision to use a forward-looking cost-based methodology in applying the new services test. *Id.* at 2065 ¶ 43 & n.100.

A group of BOCs now petitions for review, principally contending that the Commission lacks jurisdiction to enter the field of intrastate telephone service rate-making. Another set of petitioners, PSP trade associations New England Public Communications Council, Inc. and North Carolina Payphone Association, Inc., by contrast, not only endorses the Commission's decision to impose a forward-looking cost methodology on states setting intrastate payphone line rates, but also faults the Commission for failing to apply the same standard to the non-BOC LECs from which their members, all independent PSPs, purchase their payphone line service.

## II.

Before considering the merits, we must address the Commission's threshold argument that petitioners lack Article III standing to challenge its *Wisconsin Order*. Specifically, the Commission contends that because it has done no more than establish a standard for the Wisconsin Public Services Commission to apply in evaluating the Wisconsin BOCs' tariffs, and because it has "made no determination as to the actual payphone line rate to be charged in Wisconsin or anywhere else," neither the BOC petitioners nor the PSP petitioners have suffered an "actual or imminent" injury that is both "fairly traceable" to the *Wisconsin Order* and "likely" to be "redressed by a favorable decision," as Article III requires, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted). Respondents' Br. at 18. According to the Commission, in order to satisfy Article III, petitioners must show that they have already suffered financial injury: that is, the BOCs must show that they must charge less for payphone line service than they otherwise would have, and the PSPs must show that they will be required to pay more for payphone line service than they would if the Commission had asserted jurisdiction over non-BOC LECs' line rates. Respondents' Br. at 18–19. For that reason, the Commission argues, petitioners' challenge is premature: We cannot know whether the Commission's order directing the states to apply a particular rate-setting methodology will injure the petitioners until the states act.

Contrary to the Commission's argument, neither set of petitioners need wait for the states to review the LECs' tariffs before challenging the *Wisconsin Order*. *Cf. Verizon*, 535 U.S. at 476 (reviewing a challenge to the Commission's prescription of a forward-looking cost-based rate-setting methodology to be applied by state commissions). The BOCs' injury is both clear and immediate: The *Order*'s forward-looking cost-based methodology means that the BOCs cannot recover certain expenses beyond the current costs of providing service—namely, expenses owing to inefficiencies such as poor management or inflated capital and depreciation—that they could recover under a historical-cost method. *See id.* at 511–12. To comply with the *Wisconsin Order*, the BOCs will almost certainly have to modify their tariffs to lower their existing rates—or at the very least, refrain from raising their rates—before submitting the tariffs for state review. This injury, moreover, is both directly traceable to the *Wisconsin Order* and redressable by a decision in the BOCs' favor.

The PSP petitioners also suffer immediate injury. The *Wisconsin Order*, by departing from the *Payphone Orders* regime under which the new services test applied to both BOCs and non-BOC LECs, leaves the latter group free to set rates that discriminate against competitor PSPs. We have repeatedly held that "parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition." *Louisiana Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998). While it is true, as the Commission points out, that the states may decide on their own to apply the new services test to non-BOC LECs, the PSP petitioners need not wait for the states to set the LECs' payphone line rates before bringing their challenge. It suffices for the PSP petitioners to show that the *Wisconsin Order* has "the clear and immediate potential . . . to hurt them competitively." *Associated Gas Distribs. v. FERC*, 899 F.2d 1250, 1259 (D.C. Cir. 1990). This court "ha[s] not required litigants to wait until increased competition actually occurs." *Louisiana Energy & Power Auth.*, 141 F.3d at 367.

Mounting a second challenge to the PSP petitioners' standing, the Commission pointed out in its brief that both petitioners are out-of-state trade groups that failed to allege in their opening brief that they have any members that would be directly affected by the Wisconsin rate-setting proceedings. In response, the PSP petitioners moved for leave to file supplemental affidavits indicating that NCPA does have at least one member that operates in Wisconsin and whose payphones connect to the network via non-BOC LECs. Though the Commission does not oppose the motion, it draws our attention to this court's recent statement in *Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002), that "a petitioner whose standing is not self-evident should establish its standing by the submission of its arguments and any affidavits or other evidence appurtenant thereto at the first appropriate point in the review proceeding," and that litigants "should not expect" this court to depart from that rule "[a]bsent good cause shown." *Id.* at 900. We have no need to consider the application of *Sierra Club* in this case, however, since the PSP petitioners' standing in no way turns on their members' connections to Wisconsin. Contrary to the Commission's argument, the order on review is more than just "an adjudicatory-type proceeding . . . pertaining to rates in Wisconsin." Respondents' Br. at 18. Instead, it establishes a rule that affects payphone line rates in every state. Indeed, the Commission itself acknowledged as much, noting that "this *Order* will assist states in applying the new services test to BOCs' intrastate payphone line rates in order to ensure compliance with the *Payphone Orders* and Congress' directives in section 276." *Wisconsin Order*, 17 F.C.C.R. at 2052 ¶ 2; *see also id.* at 2072 ¶ 68 ("[W]e issue this *Order* to assist states in determining whether BOCs' intrastate payphone line rates comply with section 276 and our *Payphone Orders*.").

## III.

This brings us to the merits of petitioners' challenges to the Commission's authority under section 276 to regulate the

BOCs' intrastate payphone line rates. The Communications Act of 1934 establishes "a system of dual state and federal regulation over telephone service," under which the Commission has the power to regulate "interstate and foreign commerce in wire and radio communication," 47 U.S.C. § 151, but is generally forbidden from entering the field of intrastate communication service, which remains the province of the states, *id.* § 152(b). *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 360 (1986); *see Illinois Pub. Telecomms. Ass'n*, 117 F.3d at 561; *see also City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1155 (D.C. Cir. 1987) ("[T]he FCC enjoys jurisdiction over interstate rates, whereas the several States reign supreme over intrastate rates.").

While the apportionment of regulatory power in this dual system is, of course, subject to revision, whether the Commission may preempt state regulation of intrastate telephone service depends, as in "any pre-emption analysis," on "whether Congress intended that federal regulation supersede state law." *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 369. The "best way" to answer that question, the Supreme Court has instructed, "is to examine the nature and scope of the authority granted by Congress to the agency." *Id.* at 374. In cases involving the Communications Act, that inquiry is guided by the language of section 152(b), which the Supreme Court has interpreted as "not only a substantive jurisdictional limitation on the FCC's power, but also a rule of statutory construction." *Id.* at 373. Applying this test in a challenge to the Commission's authority under section 276 of the 1996 Act, we have held that "§ 276 should not be read to confer upon the FCC jurisdiction ... unless § 276 is so unambiguous or straightforward so as to override the command of § 152(b)." *Illinois Pub. Telecomms. Ass'n*, 117 F.3d at 561 (internal quotation marks omitted) (citing *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 377).

Here we find that section 276 unambiguously and straightforwardly authorizes the Commission to regulate the BOCs' intrastate payphone line rates. Section 276(b) directs the Commission to implement section 276(a)'s anti-subsidy and anti-discrimination mandates by undertaking five specific

measures to promote "competition among payphone service providers and ... the widespread deployment of payphone services to the benefit of the general public." 47 U.S.C. § 276(b)(1). Recognizing that the Commission's regulations implementing these commands would tread on ground traditionally occupied by the states, Congress included a preemption clause providing that "[t]o the extent that any State requirements are inconsistent with the Commission's regulations," the Commission's regulations would preempt state law. *Id.* § 276(c); *see also* S. REP. NO. 104–230, at 158 (1996) ("In crafting implementing rules, the commission is not bound to adhere to existing mechanisms or procedures established for general regulatory purposes in other provisions of the Communications Act [of 1934].").

Two of the five measures prescribed in section 276(b), moreover, expressly apply to intrastate service: subsection (b)(1)(A) directs the Commission to adopt regulations guaranteeing fair compensation for "*intrastate* and interstate call[s]," 47 U.S.C. § 276(b)(1)(A) (emphasis added), and (b)(1)(B) requires the Commission to "discontinue the *intrastate* and interstate carrier access charge payphone service elements ... and all *intrastate* and interstate payphone subsidies," *id.* § 276(b)(1)(B) (emphasis added). In fact, we have interpreted subsection (b)(1)(A) to permit Commission regulation of local coin rates, which was long the exclusive domain of the states. *Illinois Pub. Telecomms. Ass'n*, 117 F.3d at 561–63. And although subsections (b)(1)(D) and (b)(1)(E) do not use the word "intrastate," the two provisions authorize the Commission to promulgate regulations concerning PSPs' selection of carriers for long-distance intraLATA and interLATA calls, both of which are often intrastate calls. *See* 47 U.S.C. § 276(b)(1)(D), (b)(1)(E). As the BOCs affirm, "the FCC could not carry out this mandate without addressing intrastate matters." BOC Petitioners' Br. at 12–13. All of these provisions, which authorize the Commission to regulate both intrastate and interstate service in implementing section 276(a)'s anti-subsidy and anti-discrimination commands, indicate that those commands, too, apply to both intrastate and interstate matters.

To be sure, as the BOC petitioners emphasize, the two provisions on which the Commission relied in the *Wisconsin Order*—section 276(a)(2)'s anti-discrimination command and section 276(b)(1)(C)'s requirement that the Commission prescribe *Computer III*-like nonstructural safeguards for BOC payphone service—do not use the word "intrastate." According to the BOCs, the omission of references to intrastate services in these provisions, set against the inclusion of explicit references to intrastate services in subsections (b)(1)(A) and (b)(1)(B), demonstrates that Congress did not intend for the Commission's regulations implementing sections 276(a)(2) and 276(b)(1)(C) to cover intrastate services. For support, they cite *Russello v. United States*, 464 U.S. 16 (1983), in which the Supreme Court held that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Id.* at 23 (internal quotation marks and citation omitted). As *Russello* itself makes clear, however, it announces a presumption, not a hard-and-fast rule. Indeed, in *AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366 (1999), the Supreme Court rejected a similar argument regarding the Commission's jurisdiction to create a pricing methodology for the states, holding that a "mere lack of parallelism is surely not enough to displace [the Commission's] explicit authority." *Id.* at 385. The presumption that Congress deliberately omitted the word "intrastate" from section 276(a) seems particularly inappropriate here because the references to intrastate services appear in a portion of the statute specifying measures to implement section 276(a)'s general prohibitions on BOC subsidies and discrimination. *Cf. Clay v. United States*, 537 U.S. 522, 123 S. Ct. 1072, 1078 (2003) ("An unqualified term[,] . . . *Russello* indicates, calls for a reading surely no less broad than a pinpointed one. . . ."). If Congress had meant to prohibit only interstate subsidies and discrimination, it is difficult to understand why it would have directed the Commission to regulate *intrastate* call compensation and *intrastate* payphone subsidies.

The statute's structure and purpose also support the Commission's assertion of jurisdiction. Much like the 1996 Telecommunications Act's local competition provisions, section 276(a)'s command that BOCs shall neither subsidize nor discriminate in favor of their own payphone service, 47 U.S.C. § 276(a), is designed to replace a state-regulated monopoly system with a federally facilitated, competitive market. Observing that limiting Commission jurisdiction to interstate matters "would utterly nullify the 1996 amendments," the Supreme Court in *Iowa Utilities Board* affirmed the Commission's authority to "design a pricing methodology" to bind state rate-making commissions in implementing the Act's local competition provisions. 525 U.S. at 380, 385. Rejecting a section 152(b) challenge to the Commission's jurisdiction, the Court noted that "[a]fter the 1996 Act, § 152(b) may have less practical effect . . . . because Congress, by extending the Communications Act into local competition, has removed a significant area from the States' exclusive control." *Id.* at 382 n.8.

Of course, unlike *Iowa Utilities Board*, which involved purely local, intrastate facilities and services, both intrastate and interstate facilities and services are at issue here. But in passing the 1996 Act's payphone competition provision and the local competition provisions, Congress had exactly the same objective: to authorize the Commission to eliminate barriers to competition. And much as the Supreme Court concluded it would be impossible to implement the local competition provisions while limiting the Commission's authority to interstate services, so would it make little sense for Congress to command the Commission to promulgate rules opening the payphone market to competition while leaving it powerless to address intrastate subsidies and discrimination, which are, after all, no less an obstacle to fair competition than interstate subsidies and discrimination.

The BOC petitioners next contend that even if section 276(a) bars intrastate discrimination, it does not authorize the Commission to prescribe any particular rate-making methodology. According to the BOCs, discrimination consists only of charging unlike prices for like services, and section 276's anti-

discrimination command therefore requires only pricing parity.  The BOCs argue that the Commission itself took this position in *Computer III* when it declined to mandate any particular pricing standard for enhanced services, choosing instead to require BOCs to allow competitors to use basic network services on the same terms as the BOCs themselves used those services.  *See* In the Matters of Amendment of Sections 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry), 104 F.C.C.2d 958, 1052 ¶ ¶ 183–184 (1986) (Report and Order).  But the Commission has revised this position.  Indeed, the new services test was an outgrowth of the Commission's recognition that pricing parity alone would still permit BOCs to discriminate by "set[ting] relatively low rates for the [basic service elements] that they use, while pricing those that they do not need at relatively high rates."  In the Matter of Amendments of Part 69 of the Commission's Rules Relating to the Creation of Access Charge Subelements for Open Network Architecture, 4 F.C.C.R. 3983, 3985 ¶ 18 (1989) (Notice of Proposed Rulemaking); *see also Access Charge Subelements Order*, 6 F.C.C.R. at 4531 ¶ ¶ 38–44.  Nothing in the statute indicates that Congress understood the word "discrimination" to carry the narrow meaning the BOCs urge, as opposed to the more expansive view the Commission adopted in its refinements to the *Computer III* regime.

Approaching the *Wisconsin Order* from the opposite angle, the PSP petitioners contend that section 276 confers on the Commission not only the authority to regulate BOCs' intrastate payphone line rates, but also the authority to extend its regulations to non-BOC LECs.  For support, the PSPs rely primarily on the statute's purposes, contending that non-BOC LEC discrimination against competitors represents no less an obstacle to fair competition in the payphone industry than BOC discrimination.  Though the PSPs may be correct as a matter of policy, the fact remains that sections 276(a) and 276(b)(1)(C), the sources of the Commission's authority to regulate intrastate payphone rates, expressly apply only to the BOCs.  We must presume that when Congress referred to "Bell operating companies" rather than "local exchange

carriers," it acted deliberately. Indeed, the Act defines the terms differently. 47 U.S.C. § 153(4), (26). The PSPs have, moreover, fallen short of demonstrating that this is one of the "'rare cases'" in which we may look beyond clear statutory text to discern the statute's meaning because "'literal application of [the] statute will produce a result demonstrably at odds with the intentions of its drafters.'" *Nat'l Pub. Radio, Inc. v. FCC*, 254 F.3d 226, 230 (D.C. Cir. 2001) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989)); *see also id.* (a party seeking to "rebut[ ] the presumption created by clear language . . . must show either that, as a matter of historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost surely could not have meant it") (internal quotation marks and citation omitted).

The PSPs argue that even if section 276 does not confer on the Commission the requisite authority, the Commission may invoke other statutory provisions—specifically, section 201(b), the Communications Act's general rulemaking provision, section 202(a), the Act's antidiscrimination provision, and section 205(a), which authorizes the Commission to prescribe just and reasonable charges. 47 U.S.C. §§ 201(b), 202(a), 205(a). Such general provisions cannot, however, trump section 152(b)'s specific command that no Commission regulations shall preempt state regulations unless Congress expressly so indicates. *See Iowa Utils. Bd.*, 525 U.S. at 382 n.8 ("Insofar as Congress has remained silent . . . § 152(b) continues to function."). Absent authorization to apply its section 276 regulations to non-BOC LECs, the Commission may not regulate their intrastate payphone line rates.

## IV.

Finally, the BOCs argue that the Commission acted arbitrarily and capriciously by imposing a forward-looking cost-based methodology for basic transmission rates. Specifically, the BOCs claim that (1) pricing under the new services test is not rationally related to the statute's goal of preventing discrimination; (2) the *Order* is inconsistent with *Computer*

*III*, in which the Commission did not alter the basic line rate; and (3) the Commission has not applied a forward-looking cost-based methodology to federal subscriber line charges, which, according to the BOCs, are analogous to payphone line rates.

The Commission objects to our consideration of these arguments on the ground that it "has been afforded no opportunity to pass" on them. 47 U.S.C. § 405(a)(2). The BOCs point out that they did in fact raise all of these arguments before the Commission, but they neglect to mention that they made each argument in the course of challenging the Commission's authority to set intrastate payphone line rates and never presented the type of substantive challenge they make here.

Because the BOCs failed explicitly to make a substantive challenge, "we must determine whether 'a reasonable Commission *necessarily* would have seen the question raised before [the Court] as part of the case presented to it.'" *AT&T Corp. v. FCC*, 317 F.3d 227, 235 (D.C. Cir. 2003) (citation omitted) (emphasis in original). In considering this question, we "bear[ ] in mind that . . . a litigant before the Commission . . . ha[s] 'at least a modicum of responsibility for flagging the relevant issues.'" *Id.* (citation omitted). Claiming at oral argument that the BOCs did "flag" the issue, counsel pointed to a single sentence in a letter to the Commission regarding its jurisdiction, which stated that imposing a rule different from the rules that apply to federal subscriber line charges "would not only be beyond the Commission's jurisdiction, it would be arbitrary and capricious." Letter from Aaron M. Panner, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C., to Magalie Salas, Secretary, Federal Communications Commission (Jan. 22, 2002). This was insufficient. Given that the BOCs' three arguments were focused on the Commission's jurisdiction, and given that the phrase "arbitrary and capricious" appears just once in the middle of a letter otherwise wholly dedicated to the BOCs' jurisdictional argument, "we cannot say that a reasonable Commission 'necessarily would have seen'" that the BOCs were questioning not only the Commission's authority to promulgate rules regulating intrastate payphone line rates, but also the reason-

ableness of those rules. *AT&T*, 317 F.3d at 236 (citation omitted). Nor did any statement in an ex parte filing entitled "An Analysis of the Scope of Commission Jurisdiction Over Intrastate Payphone Line Rates" (filed Oct. 15, 2001), which counsel also identified as "flagging" the issue, necessarily put the Commission on notice of the BOCs' substantive challenge. As we have repeatedly held, "[t]he Commission 'need not sift pleadings and documents to identify' arguments that are not 'stated with clarity' by a petitioner." *Bartholdi Cable Co., Inc. v. FCC*, 114 F.3d 274, 279 (D.C. Cir. 1997) (citation omitted). The BOCs should have filed a petition for reconsideration to afford the Commission an opportunity to pass on their arguments before they turned to this court for review. *See* 47 U.S.C. § 405(a)(2) (requiring a litigant first to present an argument to the Commission on reconsideration if it "relies on questions of fact or law upon which the Commission . . . has been afforded no opportunity to pass").

## V.

We deny the petitions for review and affirm the *Wisconsin Order* in all respects.

*So ordered.*