PILLARD, Circuit Judge,
dissenting as to Sections II.B through II.F and concurring in part:
The administrative record is full of compelling evidence of dysfunction in the inmate-calling marketplace, with harsh consequences for inmates and their families. The rule under review began with a 2000 lawsuit filed by inmates, family members, loved ones, and counsel (referred to in these proceedings as the Wright Petition *61 ers). Finally acting on the Wright Petitioners’ concerns, the FCC in 2015 modestly curtailed exorbitant per-minute calling rates and limited providers’ ability to extract confusing and unrelated ancillary fees — amounting to as much as 38 percent of total inmate-calling revenue — for such things as setting up an account, funding an account, issuing a refund, and closing an account. See 30 FCC Rcd. 12763, 12838-42 (2015). The record shows that these high prices impair the ability of inmates, by definition isolated physically from the outside world, to sustain fragile filaments of connection to families and communities that they might hope to rejoin. The majority’s decision scuttles a long-term effort to rein in calling costs that are not meaningfully subject to competition and that profit off of inmates’ desperation for connection.
The majority’s path to that result is flawed. I cannot agree that a company is “fairly compensated” under 47 U.S.C. § 276(b)(1)(A) when it charges inmates exorbitant prices to use payphones inside prisons and jails, shielded from competition by a contract granting it a facility-wide payphone monopoly. The majority does not question that Congress enacted the Telecommunications Act of 1996 to combat phone monopolies, facilitate competition, and thereby ensure better service at lower prices to consumers. Consistent with the 1996 Act’s general approach of “replacing] a state-regulated monopoly system with a federally facilitated, competitive market,” section 276 of the Act specifically addressed defects in the intrastate and interstate payphone market (now largely obsolete except in cellphone-free environments such as prisons). New England Pub. Commc’ns Council, Inc. v. FCC, 334 F.3d 69, 77 (D.C. Cir. 2003).
The majority holds it beyond debate that “fairly compensated” is not about fairness to the consumer. It sees no statutory support for the FCC’s effort to require fairer intrastate rates for inmates because it reads section 276’s fair-compensation mandate as unambiguously one-sided, only empowering the FCC to enhance unfairly low, not to reduce unfairly high, compensation for calls. It accepts Global TePLink’s characterization of section 276 as nothing but a “no free calls” provision, Oral Arg. Tr. 40:55, confined to the enacting Congress’s acknowledged concern about independent payphone providers going uncompensated for certain calls. But that reading is truncated. As it typically does, Congress responded to a particular problem by enacting a law that speaks in more general terms: here, by requiring that payphone calls in prisons and elsewhere be “fairly compensated.” It did so for the stated purpose — fully relevant here — of promoting competition among payphone providers to expand the availability of payphone services to consumers. 47 U.S.C. § 276(b)(1).
The majority offers one plausible reading of section 276, but it is assuredly not the only one. Congress has not “directly spoken to the precise question at issue” in this case, so the question for us is whether the FCC’s view when it promulgated the challenged rule — that section 276 grants authority not only to raise inadequate rates but also to reduce excessive, monopoly-driven rates — was a “permissible construction of the statute.” Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). I think it was. If the FCC under new management wishes by notice and comment to change its rule, the statute gives it latitude to do so. We should uphold the rule that is on the books and leave to the agency to decide whether and how to change it.
I.
The FCC reasonably interpreted section 276 to “authorize the Commission to im *62 pose intrastate rate caps as prescribed in the Order.” Op. at 51. Congress instructed the FCC to “establish a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone[s].” 47 U.S.C. § 276(b)(1)(A). To begin with, nobody contests that authority to establish “a per call compensation plan” includes some authority over end-user calling rates. Indeed, this court already so held. See Illinois Public Telecommunications Ass’n v. FCC, 117 F.3d 555, 562 (D.C. Cir. 1997) (“Because ... there is no indication that the Congress intended to exclude local coin rates from the term ‘compensation’ in § 276, we hold that the statute unambiguously grants the Commission authority to regulate the rates for local coin calls.”). And the plain text of the statute grants that authority over both intrastate and interstate payphone services, including “inmate telephone service in correctional institutions.” 47 U.S.C. § 276(d). Thus, the only dispute is whether the word “fairly” implies an ability to reduce excesses, as well as bolster deficiencies, in the compensation that payphone providers would otherwise receive.
Importantly, Congress chose “fairly” rather than, say, “adequately,” “sufficiently,” or “amply.” Those words have different meanings. Had it used any of the latter three terms, I would agree that Congress only authorized regulation to prevent under-compensation, but its choice of the word “fairly” denotes no such limitation. Compare Webster’s New Collegiate Dictionary 407 (1980) (defining “fair” as, inter alia, “marked by impartiality and honesty: free from self-interest, prejudice, or favoritism”), with id. at 14 (defining “adequate” as, inter alia, “sufficient for a specific requirement”), and id. at 1156 (defining “sufficient” as, inter alia, “enough to meet the needs of a situation or a proposed end”). Those words are also used differently in everyday language. See Schindler Elevator Corp. v. U.S. ex rel. Kirk, 563 U.S. 401, 407, 131 S.Ct. 1885, 179 L.Ed.2d 825 (2011) (court looks to “ordinary meaning” in absence of statutory definition). If a grocer demanded $20 for a banana, we might call that price adequate, sufficient, or ample— but nobody would call it fair.
The statutory context shows that Congress’ choice of the word “fairly” reasonably connotes its concern for unfairly excessive as well as deficient compensation. Elsewhere in the Communications Act, Congress used the term “fair” in conjunction with “just” and “reasonable” — familiar terms of art used in connection with rate-setting authority. See 47 U.S.C. § 204(b) (providing for partial authorization of new charges, which would otherwise be stayed, if the FCC determines “that such partial authorization is just, fair, and reasonable”); id. § 205(a) (authorizing the FCC to prescribe “what classification, regulation, or practice is or will be just, fair, and reasonable”). And the fact that section 276 is one of several “Special Provisions Concerning Bell Operating Companies,” see Op. at 46, does not suggest that Congress exclusively intended to regulate the relationship between BOCs and non-BOCs to boost the latter’s compensation and was wholly unconcerned about the risk that callers would be charged excessive rates.
The purpose and history behind the congressional action here comport with this reading of the statutory text and context. In passing the 1996 Telecommunications Act, Congress aimed to “promotfe] competition in the payphone service industry.” New England, 334 F.3d at 71; see also 47 U.S.C. § 276(b)(1) (stating congressional purpose “to promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general pub- *63 lie”). To be sure, the immediate anti-competitive malfunction confronting Congress at the time was that certain payphone providers were, under certain circumstances, under-compensated. See Illinois Pub. Telecomms. Ass’n v. FCC, 752 F.3d 1018, 1026 (D.C. Cir. 2014). But the central .aim was to advance competition to the benefit of the end users of payphone services. Senator Kerry, for instance, explained that his goal in introducing section 276 was “to establish a level playing field for independent payphone providers,” and thereby to enable competition “on the basis of price, quality and service, rather than on marketshare and subsidies.” 3 Reams & Manz, Federal Telecommunications Law: A Legislative History of the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996), at S710.
Consistent with that pro-competitive agenda, the FCC and this court have long assumed that section 276 provides tools for addressing monopoly power and market failure in the payphone market. For instance, in Illinois, the state petitioners argued that the FCC had unlawfully ignored the problem of “locational monopolies,” that is, situations in which a payphone provider “obtains an exclusive contract for the provision of all payphones at an isolated location, such as an airport, stadium, or mall, and is thereby able to charge an inflated rate for local calls made from that location.” 117 F.3d at 562. We recognized that the FCC had not ignored the problem of locational monopolies; it had simply “concluded that it would deal with them if and when specific [providers] are shown to have substantial market power.” Id. Now, twenty years later, the FCC has identified a discrete area where payphone providers do have substantial market power: prisons and jails. The inmate-calling market is, the FCC found, “a prime example of market failure” because, instead of competing to reduce rates and improve services for callers, providers compete to offer ever-higher site commissions to correctional facilities so as to gain monopoly access to a literally captive consumer base. 30 FCC Rcd. at 12765 & n.9.
Nevertheless, the majority cites four considerations that influenced its rejection of the FCC’s claimed authority over intrastate inmate calling services. Op. at 51-54. None is compelling.
First, the majority notes that section 152(b) “erects a presumption against the Commission’s assertion of regulatory authority over intrastate communications.” Op. at 51-52 (citing Louisiana Pub. Serv. Comm’n v. FCC, 476 U.S. 355, 373, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986)). That is true, but section 276, by its plain terms, “overcom[es] this presumption.1’ Op. at 52. Congress instructed the FCC to ensure fair compensation for all payphone calls— interstate and intrastate. 47 U.S.C. § 276(b)(1)(A). To that end, Congress expressly provided for preemption of inconsistent state regulation. Id. § 276(c). This case is thus unlike Louisiana, which held that federal ppwer over depreciation charges pursuant to section 220 was limited to the interstate ratemaking context; it is simply not “possible” here that section 276 “do[es] no more than spell out the authority of the FCC ... in the context of interstate regulation.” Louisiana, 476 U.S. at 377, 106 S.Ct. 1890. Whatever section 276 means, it applies in both the interstate and intrastate contexts. Cf. N.Y. & Pub. Serv. Comm’n of N.Y. v. FCC, 267 F.3d 91, 102-03 (2d Cir. 2001) (concluding that section 251(e) clearly “grants the FCC authority to act with respect to those areas of intrastate service encompassed by the terms ‘North American Numbering Plan’ and ‘numbering administration,”’ and applying Chevron deference to agency’s in *64 terpretation of “what either term encompasses”).
Second, the majority says that “the Order erroneously treats the Commission’s authority under § 201 and § 276 as coterminous.” Op. at 52. My colleagues appear to draw that conclusion from the FCC’s repeated use of the phrase “just, reasonable, and fair” — an amalgam of the two provisions’ key terms. As I read the Order, the bundling of those three words simply reflects that the FCC’s authority over inmate calling derives from the sum of those authorizations. The majority’s inference that the Order fails to respect the difference between sections 201 and 276, and in particular, fails to appreciate that section 201 applies only to interstate rates, has no support in the record.
Third, the majority concludes that the FCC erred in finding support for its approach in prior agency orders. Op. at 52-53. The majority says that “the prior orders ... focused on payphone providers and carriers to determine whether the providers were fairly compensated.” Op. at 53. But this court has held that “compensation” includes end-user rates; it is not limited to payments between payphone providers and carriers. Illinois, 117 F.3d at 562 (“[W]e hold that the statute unambiguously grants the Commission authority to regulate the rates for local coin calls.”).
Fourth, the majority says the FCC mistakenly relied on this court’s decisions in Illinois and New England. Op. at 53-55. The majority acknowledges that Illinois “held that § 276 unambiguously overrode § 152(b)’s presumption against intrastate jurisdiction insofar as it granted the Commission authority to ‘set’ reimbursement rates for local coin calls in order to ensure that payphone operators who were previously uncompensated were ‘fairly compensated.’ ” Op. at 53-54. According to the majority, however, setting rates to increase providers’ compensation is different from reducing “already compensatory rates.” Op. at 54. Yet Illinois ratified the FCC’s assertion of authority to regulate “locational monopolies.” 117 F.3d at 562. The majority responds that the FCC never said it would consider intrastate rate caps as the means of breaking up such monopolies. See Op. at 54. But the FCC, as we noted in Illinois, “specifically reserved the right to modify its deregulation scheme, for example, by limiting the number of compensable calls from each payphone.” 117 F.3d at 563. Limiting the number of compensable calls per phone is, of course, economically similar to limiting the rate per call; either incentivizes broader deployment of payphones to maintain the same revenue levels. Thus, the FCC contemplated, and the Court approved, just the sort of pro-consumer regulation the FCC eventually undertook in the Order under review.
Petitioners argue that in the rule at issue in Illinois, the FCC had merely claimed the authority “to adjust the per-call compensation scheme that the FCC itself put in place to ensure fair compensation,” not the “authority to regulate existing market rates.” ICS Pet’rs Br. 46 n.31. That is a false dichotomy. Cf. Illinois, 117 F.3d at 563 (“A market-based approach is as much a compensation scheme as a rate-setting approach.”). The bottom line is that the FCC anticipated the problem of monopoly power in the provision of payphone services, and this Court ratified the agency’s authority to combat that problem by reducing providers’ compensation, including by adjusting end-user rates. There is thus no basis for the majority’s contention that “the FCC consistently construed its authority over intrastate payphone rates as limited to addressing the problem of *65 under-compensation for ICS providers.” Op. at 44.
The majority also takes issue with the Order’s invocation of New England, but the FCC correctly relied on that precedent for the limited point that “section 276 unambiguously and straightforwardly authorizes the Commission to regulate [the Bell Operating Companies’] intrastate payphone line rates.” 30 FCC Rcd. at 12815 (quoting 334 F.3d at 75). The fact that the FCC and this court previously articulated section 276 authority in terms of generic rate regulation is relevant here. And, contrary to the majority, New England's holding that section 276(b)(1)(C) does not apply to non-Bell Operating Companies has no resonance in this case. The provision at issue here, section 276(b)(1)(A), is indisputably applicable to non-BOCs: it requires that “all payphone service providers [be] fairly compensated.” 47 U.S.C. § 276(b)(1)(A) (emphasis added).
None of this is to suggest that the FCC has the same “broad plenary authority to regulate and cap intrastate rates” that it has over interstate rates. Op. at 54-55. Notably, whereas section 201 broadly requires that “[a]ll charges, practices, classifications, and regulations for and in connection with [interstate] communication serviee[] shall be just and reasonable,” section 276 is more narrowly focused on “compensation.” The FCC simply did not need “broad plenary authority” to conclude that inmate calling service providers charging as much as $56.00 for a four-minute call, see Op. at 46-47, were not being “fairly compensated.”
II.
The majority also holds that the FCC’s complete exclusion of site commissions from its cost calculus and its use of industry-wide averages were arbitrary and capricious. See Op. at 55-58. It is unclear why the majority finds it necessary to address how the caps were calculated, given its rejection of the FCC’s power to cap at all. In any event, the majority’s analysis is misguided.
Regarding site commissions, the majority says that “[ignoring costs that the Commission acknowledges to be legitimate is implausible.” Op. at 56. But the FCC did not acknowledge site commissions as legitimate costs. Quite to the contrary, the FCC agreed with a commenter who described site commissions as “legal bribes to induce correctional agencies to provide ICS providers with lucrative monopoly contracts.” 30 FCC Rcd. at 12821. In other words, the FCC viewed site commissions not as real costs of doing business, but as “an apportionment of profit” between providers and correctional facilities. Id. at 12822. The majority suggests that if site commissions are “directly related to the provision” of inmate calling services in that they are conditions of receiving contracts to provide such services, they are “therefore legitimate.” Op. at 56. That equation makes no sense; the fact that a cost was charged under a prior regulatory regime cannot mean the agency is required to recognize that cost as “legitimate” and is disempow-ered from regulating it.
Simply put, the fact that a state may demand them does not make site commissions a legitimate cost of providing calling services. The majority asserts that “[i]n some instances, commissions are mandated by state statute,” Op. at 56, but the record reflects that there is only one such statute, Tex. Gov’t Code Ann. § 495.027(a)(2). That statute categorically demands site commissions of at least 40 per cent of the provider’s gross revenue, which only illustrates the problem that site commissions are a form of monopoly rent not tied to actual costs.
*66 Indeed, considering site commissions as a compensable cost would effectively negate the FCC’s authority to mitigate locational monopolies. Imagine that a payphone provider (in the pre-cell phone era) contracted with a large stadium to provide just three payphones, anticipating that its monopoly would enable it to charge several dollars per minute while kicking back some percentage to the stadium. Plainly, the statutory goals of “competition” and “widespread deployment of payphone services” could be well served by a rule imposing reasonable, market-sensitive price caps to spur providers to offer more phones to maintain the same levels of revenue. 47 U.S.C. § 276(b)(1). But any such price cap would be worthless if it had to be calculated to ensure that the provider could continue its kickbacks to the stadium. The kickback arrangement might, in some sense, be “related” to the provision of payphone services at the stadium, but it is not “reasonably” related because acceding to such preexisting contractual relationships is inconsistent with the statutory scheme.
On the averaging issue, the majority concludes that because the Order “makes calls with above-average costs ... unprofitable,” it “does not fulfill the mandate of § 276 that ‘each and every’ inter- and intrastate call be fairly compensated.” Op. at 57. This holding seems to follow from the majority’s pinched interpretation of section 276 as a one-way ratchet whereby providers are always entitled to recoup “actual” costs incurred under monopoly conditions, no matter how extravagant. As I have explained, I believe that section 276 conveys some authority to lower rates, which means the FCC need not take as given “calls with above-average costs.”
Additionally, the majority fails to reckon with the FCC’s independent authority to cap rates for interstate calls under section 201, despite acknowledging that this power is “broad” and “plenary.” Op. at 54. In my view, the FCC has wide discretion under its section 201 “just and reasonable” interstate ratemaking authority to decide which costs to take into account and to use industry-wide averages that do not necessarily compensate “each and every” call, as section 276 requires. See Nat’l Ass’n of Regulatory Util. Comm’rs v. FERC, 475 F.3d 1277, 1280 (D.C. Cir. 2007) (agency is not “weaponless against conduct that might encourage or cloak the running up of unreasonable costs”). As the state petitioners aptly summarized, section 201 “gave the Commission broad regulatory authority over interstate communication in a ‘traditional form,’ mirroring regulation of railroads and public utilities, enabling it to set rates to allow a monopolistic utility to recover a reasonable profit but also protect the consumer from unjustly high prices.” State Pet’rs Br. at 28-29. The majority never explains why the FCC’s rate-setting methodology would be impermissible as to the interstate caps.
III.
Finally, I note that the majority offers no persuasive reason for abandoning the Chevron framework (which it admittedly does only in dicta, as Chevron deference plays no role in an opinion holding section 276 unambiguous). It acknowledges that the Order is “presumptively subject” to deferential review, but then concludes that “it would make no sense for this court to determine whether the disputed agency positions advanced in the Order warrant Chevron deference when the agency has abandoned those positions.” Op. at 50. Absent any briefing on the subject or any citation to precedent, I cannot agree.
The FCC, through notice-and-comment rulemaking, took certain positions — most notably that section 276 authorizes regula *67 tion of the fairness of intrastate inmate-calling rates — and defended them vigorously in briefing before this court. Less than a month before argument, the court on its own motion directed the parties to explain whether this case should be held in abeyance in light of recent personnel changes at the FCC. The FCC responded that the court should “move forward on the current schedule.” Doc. No. 1656116 (Jan. 17, 2017). Two weeks later, and just a week before argument, the FCC informed us that it would no longer defend certain points that it had briefed, but that the Wright Petitioners would “defend all aspects of the Order.” Doc. No. 1658521 (Jan. 31, 2017). The FCC has not committed to formally reviewing the Order, as other similarly situated agencies have recently done. See, e.g., Murray Energy Corp. v. EPA, No. 15-1385, Doc. No. 1670218 (April 7, 2017) (requesting postponement of oral argument so that agency could “fully review” the relevant rule). By suggesting that agencies can relinquish judicial deference through such limited and belated maneuvers as refusing to defend portions of their briefs during oral argument, the majority risks enabling agencies to end-run the principle that they must “use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance.” Perez v. Mortgage Bankers Ass’n, — U.S. -, 135 S.Ct. 1199, 1206, 191 L.Ed.2d 186 (2015).
[[Image here]]
The majority appears to leave an opening for the FCC — on some other record and by some other reasoning — to rein in excessive inmate-calling rates, both interstate and intrastate. See Op. at 51, 56, 57 (limiting its analysis to the record in this case). And the majority invites the FCC to determine whether some “portions of site commissions” are illegitimate and non-compensable. Op. at 56. Still, because the majority shortchanges the FCC’s authority to reduce excessive, monopoly-driven rates, finds “implausible” the agency’s reasoned approach to a grave problem, and unnecessarily suggests limitations on Chevron deference, I respectfully dissent from Sections II.B through II.F of the majority opinion.