CINCINNATI BELL TELEPHONE COMPANY, Appellant,

v.

KENTUCKY PUBLIC SERVICE COMMISSION; The Kentucky Payphone Association, Inc., Appellees.

and

Bellsouth Telecommunications, Inc., Appellant,

v.

Public Service Commission of Kentucky; Kentucky Payphone Association, Inc.; Cincinnati Bell Telephone Company; Kentucky Alltel, Inc; Accucom, Inc.; Alltel Kentucky, Inc.; American Communication Services of Louisville, Inc.; Annox, Inc.; At & T Communications of the South Central States, LLC; Ballard Rural Telephone Cooperative Corporation, Inc.; Brandenburg Telephone Company; Coin Phone Management Company; Duo County Telephone Cooperative Corporation, Inc.; Foothills Rural Telephone Cooperative Corporation, Inc. d/b/a Foothills Long Distance; GTE South Incorporated n/k/a Verizon South, Inc.; Harold Telephone Company, Inc.; Highland Telephone Cooperative, Inc.; Inter Mountain Cable, Inc.; Legal Aid Society, Inc.; Lewisport Telephone Company; Logan Telephone Cooperative, Inc.; Mountain Rural Telephone Cooperative Corporation, Inc.; Mountain Telephone Cooperative, Inc. North Central Telephone Cooperative Corporation; Peoples Rural Telephone Cooperative Corporation, Inc.; South Central Rural Telephone Cooperative Corporation, Inc.; South Central Telecom, LLC; Southeast Telephone, Inc.; TDS–Telecom Southeast Division;

Thacker–Grigsby Telephone Company, Inc.; West Kentucky Rural Telephone Cooperative Corporation, Inc.; and Larkins Communications, Inc. n/k/a Jack Larkins Enterprises, Inc., Appellees.

and

Cincinnati Bell Telephone Company, Appellant,

v.

Kentucky Public Service Commission; The Kentucky Payphone Association, Inc.; Bellsouth Telecommunications, Inc.; Kentucky Alltel, Inc.; Accucom, Inc.; Alltel Kentucky, Inc.; American Communications Services of Louisville, Inc.; Annox, Inc.; AT & T Communications of the South Central States, LLC; Ballard Rural Telephone Cooperative Corporation, Inc.; Brandenburg Telephone Company; Coin Phone Management Company; Duo County Telephone Cooperative Corporation, Inc.; Foothills Rural Telephone Cooperative Corporation d/b/a Foothills Long Distance; GTE South Incorporated n/k/a Verizon South, Inc.; Harold Telephone Company, Inc.; Highland Telephone Cooperative, Inc.; Inter Mountain Cable, Inc.; Larkins Communications, Inc. n/k/a Jack Larkins Enterprises, Inc.; Legal Aid Society, Inc.; Lewisport Telephone Company; Logan Telephone Cooperative, Inc.; Mountain Rural Telephone Cooperative Corporation, Inc.; Mountain Telephone Cooperative, Inc.; North Central Telephone Cooperative Corporation; Peoples Rural Telephone Cooperative Corporation, Inc.; South Central Rural Telephone Cooperative Corp. Inc.; South Central Telecom,

LLC; Southeast Telephone, Inc.; TDS–Telecom Southeast Division; Thacker–Grigsby Telephone Company, Inc.; and West Kentucky Rural Telephone Cooperative Group, Inc., Appellees.

and

Kentucky Alltel, Inc., Appellant,

v.

Kentucky Payphone Association, Inc.; Public Service Commission of Kentucky; Bellsouth Telecommunications, Inc.; and Cincinnati Bell Telephone Company, Appellees.

Nos. 2004–CA–002659–MR, 2005–CA–001459–MR, 2005–CA–001644–MR, 2005–CA–001674–MR.

Court of Appeals of Kentucky.

Feb. 2, 2007.

Rehearing Denied May 2, 2007.

Sheryl G. Snyder, Jack B. Harrison, Jason P. Renzelmann, Louisville, KY, Ann Jouett Kinney, Cincinnati, OH, for appellant Cincinnati Bell Telephone Company.

Mark R. Overstreet, Frankfort, KY, Dorothy J. Chambers, Louisville, KY, for Appellant Bellsouth Telecommunications, Inc.

James H. Newberry, Jr., Lexington, KY, for Appellant Kentucky Alltel, Inc.

David S. Samford, Amy E. Dougherty, John E.B. Pinney, Frankfort, KY, for Appellee Public Service Commission of Kentucky.

John Selent, Holly Wallace, Louisville, KY, Henry T. Kelly, Joseph E. Donovan, Chicago, IL, for Appellee Kentucky Payphone Association.

Before COMBS, Chief Judge; WINE, Judge; PAISLEY,[1] Senior Judge.

## OPINION

COMBS, Chief Judge.

Three telecommunications companies, Cincinnati Bell Telephone Co., Kentucky Alltel, Inc., and BellSouth Telecommunications, Inc., appeal an order of the Franklin Circuit Court that had affirmed an order of the Kentucky Public Service Commission (the PSC or the Commission). At issue is the validity of a refund ordered by the PSC. The telecommunication companies had collected sums of money from

---

1. Senior Judge Lewis G. Paisley sitting as Special Judge by assignment of the Chief Jus-tice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

independent payphone service providers pursuant to a rate established in prior PSC proceedings. The PSC order before us has required a refund of a portion of those funds from the payphone providers. The appeals have been consolidated for hearing and decision. After our review of the extensive record and briefs of each of the parties, we reverse.

These appeals involve a complex combination of directives issued by the Federal Communications Commission pursuant to the Telecommunications Act of 1996 and the proceedings undertaken by the PSC in response. In order to provide an adequate background, a rather detailed summary of the facts and the law is required.

### Background and History

During the 1980's, incumbent local exchange carriers such as Cincinnati Bell, Alltel, and BellSouth dominated local wireline telephony. Seeking to induce competition, the Federal Communications Commission (FCC) issued an order in 1984 requiring local exchange carriers to offer payphone services access to independent payphone service providers. The independent payphone service providers typically owned the payphone units and contracted directly with property owners to locate the units in profitable, high-traffic areas. Since coin-operated payphones remained integrated with and dependent upon the local exchange carriers' networks, the FCC's effort to "level the playing field" proved largely unsuccessful. The local ex-

change carriers were able to subsidize the costs of providing their own payphone service to the public with revenues derived from their other services, thus generally stifling the ability of independent payphone service providers to compete. Consequently, the payphone market remained relatively static. See Benjamin Lipschitz, *Payphone Regulation Under the Telecommunication Act of 1996*, 5 Media Law and Policy 13 (Winter 1996).

The Telecommunications Act of 1996 transformed telecommunications regulation and renewed the FCC's efforts to stimulate competition and innovation—particularly with respect to local telecommunications markets. Armed with a mandate from Congress, including the authority to pre-empt conflicting state regulations, the FCC began to act aggressively to encourage a competitive free-market for advanced telecommunications and information technologies services.[2]

Pursuant to section 276 of the Act, the FCC was empowered "to promote competition among payphone service providers and to promote the widespread deployment of payphone services to the benefit of the general public." 47 U.S.C. § 276(b)(1). The FCC focused on the disproportionate competitive advantage enjoyed by many of the entrenched local exchange carriers and issued administrative orders commonly referred to as the *Payphone Orders*. These payphone orders required the local carriers to establish forward-looking, cost-based rates for the lines used by indepen-

---

**2.** Despite its laudatory goals, critics have attacked the statute relentlessly as having "failed to deliver on its large promises." Reza Dibadj, *Competitive Debacle in Local Telephony: Is the 1996 Telecommunications Act To Blame?*, 81 Washington Univ. L.Q. 1, 2 (Spring 2003), *citing* Lance Liebman, *Foreward: The New Estates*, 97 Columbia L.Rev. 819, 825 (1997). The Supreme Court, too, has commented that "[i]t would be a gross

understatement to say that the 1996 Act is not a model of clarity. It is in many important respects a model of ambiguity or indeed even self-contradiction. That is most unfortunate for a piece of legislation that profoundly affects a crucial segment of the economy worth tens of billions of dollars." Reza Dibadj, *supra*, at 2, *citing*, AT&T Corp. v. Iowa Utilities. Bd., 525 U.S. 366, 397, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999).

dent payphone service providers. The new rates were to include only a fairly allocated portion of the overhead costs of the local exchange carriers. The new payphone line rates charged to the independent payphone service providers had to comply with the "new services test," a tariff guideline that had evolved out of other FCC proceedings. The FCC explained that a period of transition would be necessary as the market developed. Therefore, the FCC would rely initially on state commissions (with federal guidance) to implement its policy. A unique brand of "cooperative federalism" was created in the arena of telecommunications regulation. Reza Dibadj, 81 Washington Univ. L.Q. 1 at 25, *citing* Phillip J. Weiser, *Chevron, Cooperative Federalism, and Telecommunications Reform,* 52 Vand. L.Rev. 1, 33 (1999).

In early 1997, three local exchange carriers, Cincinnati Bell, BellSouth, and Kentucky Alltel, filed detailed cost studies with the PSC in support of their proposed tariffs. These tariffs included payphone line rates. The Commission examined the studies. A few days before the FCC's deadline of April 15, 1997, the PSC approved tariffs filed by the local exchange carriers on an interim basis. The Kentucky Payphone Association ("KPA"), a consortium of independent payphone service providers operating in Kentucky, immediately filed a complaint with the PSC. The KPA contended that the payphone line rates established in the tariffs of BellSouth, Cincinnati Bell, and Alltel failed to comply with the tariff guideline of the new services test established by the FCC.

The PSC agreed with KPA. Following its administrative proceedings, the PSC adjusted downward the local exchange carriers' payphone line rates that had been established in the interim order. In issuing its ruling, the PSC examined two facts:

(1) the payphone line rates charged by the local exchange carriers exceeded their cost of providing the payphone service to the independent payphone service providers; (2) that initial rate had been approved strictly on an *interim* basis. Therefore, the PSC now directed Cincinnati Bell, BellSouth, and Alltel to issue refunds or credits for the overpayment. In an order entered in January 1999, the PSC determined that the refunds owed to the KPA members would be retroactive to April 15, 1997—the FCC's deadline for compliance with the newly enacted regulations. The telecommunications companies did not object to the PSC's new calculations or to its order to refund a portion of the sums collected pursuant to the interim rate. However, the KPA petitioned the PSC for rehearing.

KPA contended that the Commission's January order adjusting the payphone line rate failed to take into account the Subscriber Line Charges (SLC) billed to its members. If the local exchange carriers were permitted to collect this additional, federally imposed charge, the KPA contended that the local exchange carriers would recover more than their costs of providing the payphone line in violation of the FCC's orders. KPA requested **an additional downward adjustment** to the payphone line rates.

The PSC specifically rejected KPA's position. "The FCC does not state that the use of revenue received from the SLC should be used to offset payphone costs. The commission also declines to reach that conclusion." *In the Matter of Deregulation of Local Exchange Companies' Payphone Service,* 1999 WL 177532, Case No. 361, February 15, 1999, at 5. None of the parties appealed this decision.

Public service commissions around the country continued to struggle to implement the requirements of the new services

test and to enforce the new regulations on payphone line rates. Litigation abounded. *See* Reza Dibadj, 81 Wash. U.L.Q. at 2, 16; *see also, State ex rel. Utilities Commission v. The North Carolina Payphone Association,* 148 N.C.App. 405, 560 S.E.2d 400 (2002); *Illinois Public Telecommunications Assoc. v. FCC,* 117 F.3d 555 (D.C.Cir. 1997). Finally, in January 2002, the FCC issued its opinion and order *In the Matter of Wisconsin Public Service Commission,* CCB/CPD No. 00–01, *Memorandum Opinion and Order* FCC 02–25 (the *Wisconsin Order* ).

In its *Wisconsin Order,* the FCC conceded that state commissions had been using quite a variety of methods to apply the new services test. *Memorandum Opinion and Order* at 2. With the *Wisconsin Order,* the FCC hoped to assist state public service commissions in applying the test in order to insure uniform compliance with the *Payphone Orders* and the Congressional directives of section 276. *Id.*

During this proceeding, the FCC also reconsidered whether it had the authority to impose federal jurisdiction upon intrastate payphone line rates charged by local exchange carriers that were not Bell Operating Companies (BOC's). "BOC's" was a term defined in the Act to include a group of specifically named telephone companies and their successors or assigns. After closely re-examining the language of the Telecommunications Act conferring jurisdiction, the FCC concluded that it lacked authority to govern **all** local exchange carriers. It acknowledged that that it could compel **only** those carriers designated by Congress as BOC's to provide intrastate payphone service at cost-based rates.

In its *Wisconsin Order,* the FCC also expanded upon the requirements of the new services test. It held that BOC's must demonstrate that their proposed payphone line rates do not recover more than the direct costs of the service—plus "a just and reasonable portion of the carrier's overhead costs." *Memorandum Opinion and Order* FCC 02–25 at 8. With respect to an allocation of just and reasonable overhead costs, the FCC stated that "the BOC must demonstrate that in setting its payphone line rates it has taken into account other sources of revenue (*e.g.* subscriber line charges (SLC) . . .)." *Id.* at 9. Otherwise, the Commission explained, the BOC would realize a double recovery of costs.

> Under the new services test, the BOC may not charge more for payphone line service than is necessary to recover from [payphone service providers] all monthly recurring direct and overhead costs incurred by BOCs in providing payphone lines. The forward-looking cost studies used to make these determinations are usually calculations of total costs, not jurisdictionally separated costs. If an incumbent BOC files in its state tariff a charge that fully recovers these unseparated costs and also assesses on the [payphone service provider] its federally tariffed SLC, the BOC will over-recover its costs, and the [payphone service provider] will over-pay, in violation of the new services test and the cost-based requirement of the *Payphone Orders.* . . .

> Therefore, in establishing its cost-based, state-tariffed charge for payphone line service, a BOC must reduce the monthly per line charge determined under the new services test by the amount of the applicable federally tariffed SLC. . . . **At whatever point in time a state reviews a BOC's payphone line rate for compliance with the new services test, it must apply an offset for the SLC that is then in effect.**

*Id.* (Emphasis added). In an opinion rendered in July 2003, the United States

Court of Appeals, D.C. Circuit, affirmed the FCC's *Wisconsin Order. New England Public Communications Council, Inc., v. Federal Communications Commission, 334 F.3d 69 (D.C.Cir., 2003)*.

In January 2002, nine months after the FCC's release of the *Wisconsin Order*, KPA petitioned the PSC to reopen its 1999 proceedings. The KPA renewed its contention that revenue derived from the SLC must be considered when determining the appropriate cost-based rate to be charged by the local exchange carriers under the requirements of the new services test. Relying on the written record and its review of the FCC's *Wisconsin Order*, the PSC determined that the local exchange carriers were required to reduce the costs of their payphone line rates by an amount equal to the SLC. This order was held to apply not only to BellSouth, the only BOC operating in Kentucky, but also to Cincinnati Bell and to Alltel. The Commission observed as follows:

> The Wisconsin Order indicates that Section 276 is only applicable to Bell Operating Companies (BOCs) but that a state commission may find it appropriate to apply the decisions in the Wisconsin Order to all [local exchange carriers]. Since the commission has previously held [Cincinnati Bell and Alltel] to the same standard as BellSouth ... it is appropriate that it should continue to do so. Section 276 of the Act was designed to make payphone services competitive. Applying the New Services Test to [Cincinnati Bell and Alltel] furthers that goal.

*Order*, Case No. 361, May 1, 2003, at 3.

The PSC agreed that KPA members had overpaid for the payphone lines based on the *Wisconsin Order*. However, it rejected KPA's demand for a refund of the amounts that its members had paid for the SLC. The PSC noted that its 1999 decision had been based on the law as it was then understood, explaining that "[t]he FCC had not provided any guidance with regard to the SLC in consideration of setting payphone access line rates." *Id.* "If the KPA believed that the Commission had erred in its decision, it should have contested the Order." *Id.* The PSC also noted that rates are final until formally modified. "They may not lawfully be changed and refunded based upon issues that were unknown at the time that they were set." *Id.*

None of the local exchange carriers challenged the PSC's authority to require the reduction of their payphone line rates on a prospective basis. Each of them timely filed revised tariffs in compliance with the order of the PSC.

KPA filed a petition for rehearing. It argued again that its members were entitled to refunds based on their payment of the local exchange carriers' inflated payphone line rates. The PSC continued to reject the argument that refunds were owed to the independent payphone service providers dating back to April 15, 1997. However, KPA's contention that refunds ought to be paid from January 31, 2002, the date upon which the FCC had issued its *Wisconsin Order*, now found support. The PSC determined that the local exchange carriers "should have taken action to adjust their rates—at least on a going-forward basis—when the FCC issued its January 31, 2002 Order explaining that SCL (sic) must be considered when setting payphone access rates." *Order*, Case No. 361, June 5, 2003, at 3. The Commission ordered Cincinnati Bell, BellSouth, and Alltel to refund to KPA members the amounts paid "in excess of the appropriate payphone access rate." *Id.*

Both KPA and the local exchange carriers appealed the decision to the Franklin Circuit Court. The appeals were consolidated pursuant to KPA's motion. The cir-

cuit court affirmed the order of the PSC in its entirety. These appeals by the telecommunications companies followed.

## Standard of Review on Appeal

The jurisdiction of the PSC extends to all utilities in Kentucky, and it has "exclusive jurisdiction over the regulation of rates and service of utilities." Kentucky Revised Statutes (KRS) 278.040(2). Consequently, the standard of review for an order entered by the PSC is necessarily circumscribed. Pursuant to the provisions of KRS 278.430, any party seeking to set aside a determination of the PSC shall bear the burden of proof to show by clear and satisfactory evidence that the determination is unreasonable or unlawful.

■ Although the PSC is granted sweeping authority to regulate public utilities pursuant to the provisions of KRS Chapter 278, it is nonetheless a creature of statute. Therefore, it "has only such powers as granted by the General Assembly." *PSC v. Jackson County Rural Elec. Coop., Inc.*, 50 S.W.3d 764, 767 (Ky.App.2000). Whether the PSC exceeded the scope of its authority is a question of law that we scrutinize closely and review *de novo. Com., Transportation Cabinet v. Weinberg*, 150 S.W.3d 75 (Ky.App.2004).

On appeal, Cincinnati Bell, Alltel, and BellSouth (the companies) contend that the circuit court erred by affirming the order of the PSC directing the companies to refund sums that exceeded the proper rate as prescribed by the FCC's *Wisconsin Order*. We agree.

While the companies have asserted numerous arguments, they overlap in many instances. Although we have reviewed all of the arguments, we shall analyze in detail only those upon which our decision is based.

## Arguments of non-BOC's: Cincinnati Bell and Alltel

■ Cincinnati Bell and Alltel together argue strenuously that the PSC lacked jurisdiction to impose the terms of the *Wisconsin Order* on them directly because they are not designated as Bell Operating Companies (BOC's) under the federal legislation. In its 1997 proceedings, the PSC was expressly relying on the guidance of the FCC: (1) as it reviewed the cost studies submitted by **all** the local exchange carriers (including BOCs and non-BOCs); (2) as it approved—on an interim basis—the carriers' payphone line rates; and (3) as it reduced those rates following the 1999 proceedings. At that time, the FCC interpreted the requirements of the federal act to apply to **all** local exchange carriers—**including non-BOCs.** Acting pursuant to the federally-imposed deadline, the PSC implemented the federal requirements as they were construed by the FCC.

In its *Wisconsin Order* of January 2002, the FCC reversed its initial position by declaring for the first time that it lacked Congressional authority to direct that the new services test be applied to non-BOCs. While the FCC "encourage[d] states to apply the new services test to **all [local exchange carriers]**," this decision was ultimately left to the various state commissions. *Memorandum Opinion and Order* at 14. (Emphasis added). Prior to the entry of the order now under review, the PSC had relied entirely upon federal directives. Even though it had clearly expressed its own state-based initiative to encourage competition in the payphone segment of the telecommunications industry, the PSC based its decisions not upon its own policy preferences but upon the formal position of the FCC.

After the *Wisconsin Order*, it would have been reasonable to assume that the PSC would continue to follow the FCC and

to adopt a policy implementing the FCC's orders across the board. However, it was neither reasonable nor legal for the PSC to order a retroactive rate change based upon an arguable state policy that had never been articulated as a matter of fact at that point. It cannot retroactively conjure up a state policy that had never come into being in order now to assert an expedient but fallacious basis for a retroactive rate change.

Again, the PSC had relied exclusively on the FCC's initial interpretation of the legislation. Thus, Cincinnati Bell and Alltel were entitled under the express terms of the *Wisconsin Order* to await a prospective decision of the PSC as to how it would regulate—**as a matter of state policy**—the non-BOCs operating in Kentucky. According to the terms of the *Wisconsin Order*, the PSC was under no obligation to impose the conditions of the new services test upon non-BOCs. Consequently, Cincinnati Bell and Alltel were not required to reduce *sua sponte* the rates they charged for payphone line as of the date of the *Wisconsin Order*. They were entitled to rely upon the PSC's final 1999 rate-setting order until such time that the PSC might announce its intentions: whether to apply the new services test to non-BOCs as a matter of state regulatory policy and whether to amend its 1999 order pursuant to newly articulated state standards.

Therefore, the PSC lacked any precedent or authority to order a retroactive reduction of the payphone line rates—including a refund of sums exceeding the rates duly established in prior proceedings involving BOC's. However, the circuit court construed the *Wisconsin Order* as giving rise to a "preemptive determination" that non-BOCs automatically could not continue to charge the rates established by the PSC in 1999. It disregarded any prospective announcement by the PSC

as to its intentions following the *Wisconsin Order* and instead impermissibly reached its own conclusions as to the impact of the *Wisconsin Order*. It clearly erred in so concluding. The order as it applies to non-BOC's must be reversed.

### Arguments of BellSouth

■ Next, we shall address the separate arguments advanced by BellSouth. BellSouth contends that the PSC's order directing the telephone companies to issue refunds was both unreasonable and unlawful. It contends that the PSC's order violates the "filed-rate doctrine" and the prohibition against retroactive ratemaking. Thus, it claims that the circuit court erred in affirming the PSC. BellSouth also asserts that the *Wisconsin Order* did not impose an obligation upon telephone companies to modify unilaterally commission-approved rates; nor did it pre-empt state statutes authorizing an order of refunds **only** under narrowly prescribed circumstances. We shall address each of these contentions in turn.

■ BellSouth relies first upon the filed-rate doctrine. That doctrine in essence stands for the proposition that when the legislature has established a comprehensive ratemaking scheme, the filed rate defines the legal relationship between the regulated utility and its customer with respect to the rate that the customer is obligated to pay and that the utility is authorized to collect. *Big Rivers Elec. Corp. v. Thorpe*, 921 F.Supp. 460 (W.D.Ky. 1996). While the doctrine has not been applied by name in Kentucky, its underlying principles are incorporated and recognized in both our statutory and our case law. *See Boone County Sand & Gravel Co. v. Owen County Rural Elec. Coop. Corp.*, 779 S.W.2d 224 (Ky.App.1989).

The PSC's statutory rate-making authority is derived from an integrated, com-

prehensive system aimed at providing stability and notice to all entities involved in the rate process. KRS 278.160 provides, in part, as follows:

(1) Under rules prescribed by the commission, each utility shall file with the commission, within such time and in such form as the commission designates, schedules showing all rates and conditions for service established by it and collected or enforced....

(2) No utility shall charge, demand, collect, or receive from any person a greater or less compensation for any service rendered or to be rendered than that prescribed in its filed schedules, and no person shall receive any service from any utility for a compensation greater or less than that prescribed in such schedules.

KRS 278.390 provides that:

Every order entered by the commission **shall continue in force until the expiration of the time, if any, named by the commission in the order, or until revoked or modified by the commission,** unless the order is suspended, or vacated in whole or in part, by order of decree of a court of competent jurisdiction. (Emphasis added.)

Similarly, KRS 278.180(1) provides as follows:

Except as provided in subsection (2) of this section, no change shall be made by any utility in any rate except upon thirty (30) days' notice to the commission, stating plainly the changes proposed to be made and the time when the changed rate will go into effect.... The commission may order a rate change only after giving an identical notice to the utility....

With respect to how rates are adjusted, KRS 278.270 provides as follows:

Whenever the commission, upon its own motion or upon complaint as provided in KRS 278.260, and after a hearing had upon reasonable notice, finds that any rate is unjust, unreasonable, insufficient, unjustly discriminatory or otherwise in violation of any of the provisions of this chapter, the commission shall by order prescribe a just and reasonable rate **to be followed in the future.** (Emphasis added).

Finally, with respect to rate changes initiated by a public utility and the authority of the commission to order a refund of sums collected, KRS 278.190 provides, in part, as follows:

(1) Whenever any utility files with the commission any schedule stating new rates, the commission may, upon its own motion, or upon complaint as provided in KRS 278.260, and upon reasonable notice, hold a hearing concerning the reasonableness of the new rates.

(2) Pending the hearing and the decision thereon, and after notice to the utility, the commission may, at any time before the schedule becomes effective, suspend the operation of the schedule and defer the use of the rate, charge, classification, or service, but not for a longer period than five (5) months beyond the time when it would otherwise go into effect if an historical test period is used, or longer than six (6) months if a forward-looking test period is used.... If the proceeding has not been concluded and an order made at the expiration of five (5) months, or six (6) months, as appropriate, the utility may place the proposed change of rate, charge, classification, or service in effect at the end of that period after notifying the commission, in writing, or its intention so to

do. Where increased rates or charges are thus made effective, the commission may, by order, require the interested utility or utilities to maintain their records in a manner as will enable them, or the commission, or any of its customers, to determine the amounts to be refunded and to whom due in the event a refund is ordered, and upon completion of the hearing and decision may, by further order, require such utility or utilities to refund to the persons in whose behalf the amounts were paid that portion of the increased rates, or charges as by its decision shall be found unreasonable.

(Emphasis added).

BellSouth contends that the rate approved by the PSC in January 1999, was and remained at all relevant times the "filed rate." Thus, based upon the constraints of the filed rate doctrine, that rate could not be altered **retroactively** by the PSC. We agree.

In its 1999 proceedings, the PSC duly adjusted the 1997 interim rates of local exchange carriers for the local exchange carriers. Each of the parties accepted the PSC's new, final rate. In light of the General Assembly's comprehensive rate-making scheme, including only a narrowly defined circumstance under which refunds can be ordered, the filed rate can only be lawfully altered **prospectively**. KRS 278.270, *supra*. Under the requirements of the statutes, the rate that the PSC authorized BellSouth to charge payphone service providers remained in full force and effect until the Commission modified it by its order of May 2003. Consequently, as a matter of law, BellSouth was never overpaid; no credits accrued; and no refunds were owed.

■ We cannot agree that the terms of the FCC's *Wisconsin Order* imposed any obligation on BellSouth to seek on its own an immediate adjustment of the filed rate. On the contrary, by its own terms, the *Wisconsin Order* contemplated further action by the appropriate state regulatory commission before the new requirements would take effect. The order expressly provided that "[a]t whatever point in time a state reviews a BOC's payphone line rates for compliance with the new services test, it must apply an offset for the SLC that is then in effect." *Memorandum and Order* at 20. (Emphasis added). The FCC was keenly aware that state commissions had encountered confusion, difficulty, and inconsistency in applying the new services test and that uniform application had not been achieved. The order in no way directs BOC's to seek state commission authority to adjust any rate previously established by state regulators—even if such a rate had been based on an erroneous application of the new services test.

In its *Wisconsin Order*, the FCC elected to leave implementation of its new requirements to a time when state regulators might review a BOC's payphone line rates for compliance. That decision was wholly consistent with traditional rate-making principles. Regulatory rate-setting is a remarkably complex process involving economic judgments intertwined with and interdependent upon many factors. While individual elements are subject to almost constant fluctuation, the filed rate is not altered on an ongoing basis to reflect those changes. Instead, the rate holds constant until a rate change is formally requested or a challenge to the rate is raised by an interested party.

■ Finally, we are not convinced that the FCC's holdings in the *Wisconsin Order* were intended to pre-empt our state

regulatory requirements in any way. The FCC recognized that the federal re-structuring of telecommunications regulation was sweeping and that market changes contemplated by the legislation would require a period of transition. Although Congress had authorized it to pre-empt conflicting state regulations, the FCC expressed a strong interest in maintaining federal—state comity. It chose to rely on the on the state regulatory mechanisms already in place to effect the desired changes—specifically with respect to rate-setting proceedings. The *Wisconsin Order* did no more than to direct state agencies to implement the refined requirements of the new services test in accordance with their own statutory schemes.

We are reinforced in our opinion by the unique system devised by Congress and reflected in the Act that requires the cooperation of federal and state regulators in the so-called "new federalism" without resort to pre-emptive measures. Since the PSC's refund order clearly did not conform either to Kentucky statutory authority or to its own policies, and since no federal directive superseded those statutory requirements, the order must be reversed.

Based upon the foregoing, the judgment of the Franklin Circuit Court is reversed.

ALL CONCUR.