**COMMONWEALTH of Kentucky, ex rel. Gregory D. STUMBO, Appellant/Cross-Appellee**

v.

**KENTUCKY PUBLIC SERVICE COMMISSION; Kentucky Industrial Utility Customers, Inc.; Kentucky Power Company d/b/a American Electric Power, Appellees/Cross-Appellants.**

Nos. 2006–CA–002349–MR, 2006–CA–002350–MR, 2006–CA–002552–MR.

Court of Appeals of Kentucky.

Dec. 7, 2007.

Michael L. Kurtz, Kurt J. Boehm, Cincinnati, OH, for Kentucky Industrial Utility Customers, Inc.

Lawrence W. Cook, Assistant Attorney General, Office of Rate Intervention, Frankfort, KY, for Appellant/Cross–Appellee, Commonwealth of Kentucky ex. rel. Gregory D. Stumbo, Attorney General, And Appellee/Cross–Appellant Kentucky Industrial Utilities Commission.

Bruce F. Clark, R. Benjamin Crittenden, Frankfort, KY, for Appellee/Cross–Appellant Kentucky Power.

David S. Samford, Richard W. Bertelson, III, Quang D. Nguyen, Frankfort, KY, for Appellee Public Service Commission.

Before DIXON and LAMBERT, Judges; ROSENBLUM,[1] Senior Judge.

## OPINION

ROSENBLUM, Senior Judge.

The Commonwealth of Kentucky, ex. rel. Gregory D. Stumbo (AG), appeals from an order of the Franklin Circuit Court upholding the Public Service Commission's (Commission) determination that Kentucky Power (KP) is entitled to immediately include in its rates certain environmental related costs pursuant to the surcharge provisions of KRS[2] 278.183. Kentucky Industrial Utility Customers, Inc., (KIUC) cross-appeals upon the same issue as the AG. KP cross-appeals challenging the tax calculations used by the Commission in flowing the environmental-related costs through to its rates. For the reasons stated below, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

KP is an investor-owned electric utility which provides service in Kentucky. The company is, along with four sister affiliate companies, a wholly owned subsidiary of American Electric Power Company (AEP). Various aspects of KP's operations, including its rates, are regulated by the Commission. KP provides electric service in Kentucky from its own electric generating plants, but also purchases power from its sister AEP affiliate companies through an arrangement referred to as the AEP Interconnection Agreement.

---

1. Senior Judge Paul W. Rosenblum sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

2. Kentucky Revised Statutes.

The AEP Interconnection Agreement is a power pooling agreement approved by the Federal Energy Regulatory Commission (FERC) between the five sister AEP affiliate companies. The Interconnection Agreement provides that AEP affiliates which provide more generating capacity into the AEP pool than they require are compensated for their surplus contribution through a mechanism referred to as a "capacity equalization credit." Ohio Power (OP) and Indiana & Michigan Power (IMP) are the only surplus companies in the AEP system. Conversely, AEP affiliates which provide less generating capacity into the AEP pool than they require make a "capacity equalization payment" to their sister AEP surplus affiliates.

KP is a deficit company with respect to the Interconnection Agreement and, consequently, is required under the Interconnection Agreement to make a capacity equalization payment which flows to OP and IMP. Embedded within the capacity equalization payment are many generation related costs, one of which is the cost of environmental compliance equipment installed in the generating plants of OP and IMP.

The environmental compliance equipment is a necessary component of coal fired generating plants. In order to comply with environmental requirements related to coal combustion, a utility wishing to burn high sulfur coal must invest in costly scrubbers that remove sulfur from the high sulfur coal. Coal burning utilities must also comply with stringent requirements regarding nitrogen oxide, mercury, particulates, and, it may be anticipated in the near future, carbon dioxide because of its identification as a source in the rise in global temperatures. There is no dispute that the environmental equipment at issue is a necessary and vital component of coal fired generating plants.

KRS 278.183 provides a mechanism whereby electric utilities such as KP are entitled to immediately recover environmental compliance costs through a special environmental surcharge rather than having to wait until a general rate case to seek recoupment. In reliance upon this mechanism, on March 8, 2005, KP filed an application with the Commission requesting approval to amend its environmental surcharge plan and tariff in order to recover the environmental compliance costs which are embedded in its capacity equalization payment.

The environmental compliance equipment costs KP sought to recover in its Application through the environmental surcharge were related to equipment actually installed at AEP affiliate companies in a surplus position under the Agreement (OP and IMP) and not to equipment installed in KP generating facilities. Specifically, the equipment associated with the costs were installed in OP and IMP generating facilities located in West Virginia (four facilities), Ohio (three facilities), and Indiana (two facilities).

The AG, by and through his Office of Rate Intervention, and KIUC, a consortium of industrial utility consumers, intervened in the case before the Commission in opposition to KP's Application. They argued that the costs sought to be recovered by KP in its Application do not qualify for recovery through KRS 278.183.

In an Order dated September 7, 2005, the Commission substantially approved the recovery of the environmental costs as proposed by KP in its Application, though certain individual cost items not at issue in this appeal were disapproved. Over KP's objection, the Order also factored the provisions of Section 199 of the Internal Revenue Code Tax Code and the corporate tax rate reduction contained in House Bill 272 of the 2005 Regular Session of the General

Assembly into the tax gross-up calculations in determining the final increase in revenue requirements associated with the environmental surcharge increase. With slight modifications, the Commission denied the AG, KIUC, and KP's petitions for rehearing.

The AG and KIUC appealed the Commission's allowance of the surcharge recovery and KP appealed the Commission's treatment of tax issues to Franklin Circuit Court. On October 26, 2006, the circuit court entered an order affirming the Commission's Order. This appeal followed.

### STANDARD OF REVIEW

"The [Commission] acts as a quasi-judicial agency utilizing its authority to conduct hearings, render findings of fact and conclusions of law, and utilizing its expertise in the area and to the merits of rates and service issues." *Simpson County Water Dist. v. City of Franklin,* 872 S.W.2d 460, 465 (Ky.1994). "The jurisdiction of the commission shall extend to all utilities in this state." KRS 278.040(2). Further, "[t]he commission shall have exclusive jurisdiction over the regulation of rates and service of utilities[.]" Consequently, the standard of review for an order entered by the Commission is necessarily circumscribed. "In all trials, actions or proceedings arising under the preceding provisions of this chapter or growing out of the commission's exercise of the authority or powers granted to it, the party seeking to set aside any determination, requirement, direction or order of the commission shall have the burden of proof to show by clear and satisfactory evidence that the determination, requirement, direction or order is unreasonable or unlawful." KRS 278.430. The orders of the Commission "can be found unreasonable only if it is determined that the evidence presented leaves no room for difference of

opinion among reasonable minds." *Kentucky Indus. Utility Customers, Inc. v. Kentucky Utilities Co.,* 983 S.W.2d 493, 499 (Ky.1998) (citing *Energy Regulatory Com'n v. Kentucky Power,* 605 S.W.2d 46 (Ky.App.1980)).

Although the Commission is granted sweeping authority to regulate public utilities pursuant to the provisions of KRS Chapter 278, it is nonetheless a creature of statute. Therefore, it "has only such powers as granted by the General Assembly." *PSC v. Jackson County Rural Elec. Co-op., Inc.,* 50 S.W.3d 764, 767 (Ky.App.2000). Whether the Commission exceeded the scope of its authority is a question of law that we scrutinize closely and review de novo. *Com., Transportation Cabinet v. Weinberg,* 150 S.W.3d 75 (Ky.App.2004). *Cincinnati Bell Telephone Co. v. Kentucky Public Service Com'n,* 223 S.W.3d 829, 836 (Ky.App.2007). Finally, as always, we review questions of law de novo. *City of Greenup v. Public Service Com'n,* 182 S.W.3d 535, 539 (Ky.App.2005).

### APPEAL NOS.2006–CA–002349–MR AND 2006–CA–002350–MR

In Appeal Nos.2006–CA–002349–MR and 2006–CA–002350–MR the AG and KIUC, respectively, appeal the circuit court's affirming of the Commission's Order permitting KP to recover the environmental costs embedded in its payments under the Interconnection Agreement. They have filed a joint brief on the issue. They argue that the costs are not recoverable under the surcharge because (1) the plain language of KRS 278.183 does not permit recovery of the costs; (2) the facilities are not owned or controlled by KP and are not within the jurisdiction of the Commission and are not recoverable when the "entire scope" of the statute is considered; (3) recovery under the surcharge would be inconsistent with the legislative intent of

KRS 278.183; and (4) the costs should be recovered only through the traditional ratemaking process in the course of a general rate case.

### STATUTORY LANGUAGE

■ The AG and KIUC contend that the plain language of KRS 278.183 precludes the recovery of the embedded environmental cost component of KP's capacity equalization payment from being recovered through KRS 278.183. The statute provides, in relevant part, as follows:

(1) Notwithstanding any other provision of this chapter, effective January 1, 1993, a utility shall be entitled to the current recovery of its costs of complying with the Federal Clean Air Act [3] as amended and those federal, state, or local environmental requirements which apply to coal combustion wastes and by-products from facilities utilized for production of energy from coal in accordance with the utility's compliance plan as designated in subsection (2) of this section. These costs shall include a reasonable return on construction and other capital expenditures and reasonable operating expenses for any plant, equipment, property, facility, or other action to be used to comply with applicable environmental requirements set forth in this section. Operating expenses include all costs of operating and maintaining environmental facilities, income taxes, property taxes, other applicable taxes, and depreciation expenses as these expenses relate to compliance with the environmental requirements set forth in this section.

(2) Recovery of costs pursuant to subsection (1) of this section that are not already included in existing rates shall be by environmental surcharge to existing rates imposed as a positive or nega-

tive adjustment to customer bills in the second month following the month in which costs are incurred. Each utility, before initially imposing an environmental surcharge pursuant to this subsection, shall thirty (30) days in advance file a notice of intent to file said plan and subsequently submit to the commission a plan, including any application required by KRS 278.020(1), for complying with the applicable environmental requirements set forth in subsection (1) of this section. The plan shall include the utility's testimony concerning a reasonable return on compliance-related capital expenditures and a tariff addition containing the terms and conditions of a proposed surcharge as applied to individual rate classes. Within six (6) months of submittal, the commission shall conduct a hearing to:

(a) Consider and approve the plan and rate surcharge if the commission finds the plan and rate surcharge reasonable and cost-effective for compliance with the applicable environmental requirements set forth in subsection (1) of this section;

(b) Establish a reasonable return on compliance-related capital expenditures; and

(c) Approve the application of the surcharge.

The AG and KIUC argue that the Commission has misconstrued the meaning of the term "its costs" to give surcharge treatment to costs that plainly fall outside the framework of the statute. They contend that "KRS 278.183 plainly states the Company can recover 'its costs' of complying with environmental regulations. By any common understanding of that language, costs incurred by other utilities are not Kentucky Power's ('its') costs."

---

3. 42 U.S.C.A. § 7401 to 7515.

The Commission, however, determined that the plain language of KRS 278.183 unambiguously permitted the recovery of the embedded environmental compliance costs contained in its capacity equalization payment, stating as follows:

The environmental surcharge statute expressly authorizes a utility to recover by surcharge its costs of complying with specified environmental requirements. The statute does not restrict surcharge recovery to costs incurred at facilities owned by the utility or at facilities located in Kentucky. The language of the statute is unambiguous, and neither KIUC not the AG have raised a claim to the contrary.[4]

September 7, 2005, Commission Order, pg. 14.

The interpretation of a statute is a matter of law. *Commonwealth v. Garnett*, 8 S.W.3d 573, 575–6 (Ky.App.1999). However, while we ultimately review issues of law de novo, we afford deference to an administrative agency's interpretation of the statutes and regulations it is charged with implementing. *Board of Trustees of Judicial Form Retirement System v. Attorney General of Com.*, 132 S.W.3d 770, 787 (Ky.2003); *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 843–845, 104 S.Ct. 2778, 2782–2783, 81 L.Ed.2d 694 (1984) (If the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute).

Here, the AG and KIUC contend that the plain meaning of the statute excludes the environmental cost flow through, whereas the Commission concludes that the statute unambiguously permits the flow through.

In our view, the statute is not as plain as the Commission supposes and there is room for alternative interpretations. In other words the statute is, as claimed by the AG and KIUC, ambiguous, or at least silent upon the issue. Hence we believe it appropriate in our review to give deference to the Commission's interpretation as described in *Chevron*. Upon application of that deference, we cannot conclude that the Commission's interpretation of the KRS 278.183 is unreasonable or unlawful.

The crucial language at issue is the phrasing "a utility shall be entitled to the current recovery of its costs of complying with the Federal Clean Air Act [ ] as amended and those federal, state, or local environmental requirements which apply to coal combustion wastes and by-products from facilities utilized for production of energy from coal[.]"

It is undisputed that (1) the costs under consideration are, ultimately, costs associated with complying with the class of environmental regulations as identified in the statute; (2) that those costs apply to coal combustion wastes and by-products, albeit from out of state facilities; and (3) that the costs originate from facilities utilized for production of energy from coal. Hence, those aspects of the phrasing weigh in favor of the Commission's interpretation.

With respect to the term "its costs," a reasonable interpretation of the statute is that "its (KP's) costs" include those costs

4. The AG and KIUC do not cite us to their preservation of the "plain language" issue as required by CR 76.12(4)(c)(v) and the Commission's discussion of the issue indicates that they, indeed, may not have squarely raised the issue in the administrative proceedings. "Failure to properly raise an issue before an administrative body precludes a person from asserting that issue in an action for judicial review of the agency's action." *Parrish v. Kentucky Bd. of Medical Licensure*, 145 S.W.3d 401, 413 (Ky.App.2004). Nevertheless, we elect to address the issue on the merits.

embedded within its capacity equalization payment which relate to environmental compliance costs incurred by the out of state generating facilities. It is undisputed that such costs are included in the payment. A "payment" is substantially synonymous with a "cost" and, it follows, that KP incurs a "cost" associated with environmental compliance each time it makes a payment under the Agreement. Accordingly, such costs are "its costs."

In summary, the Commission has made a reasonable interpretation of KRS 278.183, and we give deference to that interpretation under the *Chevron* doctrine. The Commission's interpretation is consistent with an outcome obtainable under the normal rules of statutory construction. On the other hand, the AG and KIUC's argument that the statute's plain language does not permit a flow through of the costs is unpersuasive; actually, the statute is ambiguous or, at best, silent. Accordingly, we will not disturb the Commission's construction of KRS 278.183.

### KP CONTROL/COMMISSION JURISDICTION/"ENTIRE SCOPE"

As an extension of the above argument the AG and KIUC argue that KRS 278.183 applies only to costs incurred at KP's in-state physical facilities over which the Commission has direct jurisdiction. They allege that because the costs at issue are not under KP's direct control nor the Commission's direct jurisdiction, they are not recoverable under the statute. Because the arguments substantially overlap, under this heading we also consider the AG and KIUC's argument that the surcharge is not recoverable when the "entire scope" of the statute is considered. This latter argument, too, focuses on the out of state location of the environmental equipment and the consideration that the equip-

ment is beyond the jurisdictional reach of the Commission.

"A court may not interpret a statute at variance with its stated language." *SmithKline Beecham Corp. v. Revenue Cabinet*, 40 S.W.3d 883, 885 (Ky.App.2001). The first principle of statutory construction is to use the plain meaning of the words used in the statute. *See Revenue Cabinet v. O'Daniel*, 153 S.W.3d 815 (Ky. 2005); KRS 446.080(4). "[S]tatutes must be given a literal interpretation unless they are ambiguous and if the words are not ambiguous, no statutory construction is required." *Commonwealth v. Plowman*, 86 S.W.3d 47, 49 (Ky.2002). We lend words of a statute their normal, ordinary, everyday meaning. *Id.* "We are not at liberty to add or subtract from the legislative enactment or discover meanings not reasonably ascertainable from the language used." *Commonwealth v. Harrelson*, 14 S.W.3d 541, 546 (Ky.2000).

Upon application of the foregoing principles, we find nothing in the statute which would limit its application to costs incurred at KP's in-state physical facilities and over which the Commission has direct jurisdiction. Such language is simply not included in the statute, and we will not read such a requirement into it. At best the statute is ambiguous or silent on the issue. We accordingly refer back to our previous discussion explaining that the Commission's interpretation of the statute was reasonable—including its interpretation that the statute does not limit recovery under the surcharge to costs incurred at KP's in-state physical facilities over which the Commission has direct jurisdiction. We accordingly will not disturb the Commission's interpretation of the statute. *Chevron, supra.*

### LEGISLATIVE INTENT

The AG and KIUC additionally contend that the Commission's interpretation of the

statute is erroneous because it is not consistent with the legislative intent of the statute. In support of their argument they cite to the following language from *Kentucky Indus. Utility Customers, Inc. v. Kentucky Utilities Co.,* 983 S.W.2d 493 (Ky.1998)

> The legislative intent of the statute [KRS 278.183] was to promote the use of high sulfur Kentucky coal by permitting utilities to surcharge their customers for the cost of a scrubber which is part of a power plant that cleans high sulfur coal in order to meet the acid rain provisions of the Federal Clean Air Act amendments of 1990. This Court recognizes that both high sulfur and low sulfur coal are mined in Kentucky. The high sulfur coal is mined primarily in Western Kentucky whereas low sulfur coal is mined primarily in Eastern Kentucky. The legislature believed that some Kentucky coal was in a disfavored position because high sulfur coal was the product that required pollution control devices.

*Id.* at 496.

We are not persuaded that it follows from the Supreme Court's description of the legislative intent of KRS 278.183 that the costs under consideration may not be recovered through the surcharge. To the contrary, we believe such recovery is entirely consistent with the legislative intent of promoting the use of high sulfur coal. The facilities at issue are located in West Virginia, Ohio, and Indiana. The adapting of these adjacent-state facilities to burn high sulfur coal, it is reasonable to conclude, does "promote the use of high sulfur Kentucky coal" by stimulating the demand for high sulfur coal in general. Hence, if anything, application of the legislative intent of the statute as stated in *KIUC v. KU* weighs against the AG and KIUC's position.

## RECOVERY THROUGH GENERAL RATE CASE

Finally, the AG and KIUC argue that the better method for recovery of the costs at issue is through the traditional rate making process which is undergone in a general rate case. They argue that there may have been cost reductions in other areas of KP's operations which would offset the environmental related costs under consideration, and that KP may be currently earning a fair rate of return such that the flowing through of the costs would lead to an excessive return.

We do not construe this argument as a permissible basis for disturbing the Commission's decision. As previously noted, the legislature enacted an environmental surcharge statute and the Commission has reasonably interpreted that statute to permit the recovery of the environmental compliance costs embedded in its capacity equalization payment. The argument that it would be better if the costs were recovered in a general rate case rather than through a surcharge is nothing more than a policy argument beyond the scope of our review. Accordingly, this argument is best addressed to the legislature.

### APPEAL NO.2006–CA–002552–MR

### TAX GROSS–UP FACTOR

■ Once it is determined the amount of costs KP is entitled to recover under the environmental surcharge, those costs may not simply be added to its revenues dollar for dollar. Rather, the company must be provided with a revenue increase which, upon the deduction of the corresponding tax liability, will leave the utility with the net sum it is entitled to recover under the surcharge. In order to calculate the amount of revenues which will be required to accomplish this, a "tax gross-up" factor is determined which, when divided into the

permissible costs to be recovered, will produce the corresponding increase in revenue requirements.

Over KP's objection, the Commission factored into the tax gross-up calculation the provisions of Section 199 of the Internal Revenue Code and the corporate tax rate reduction contained in House Bill 272 of the 2005 Regular Session of the General Assembly.

As an investor owned-for-profit company, KP is subject to state and federal taxes. In reality, KP does not file a federal stand-alone tax return; rather, its income and expenses are incorporated into AEP's consolidated tax return along with its sister affiliates. KP does, however, file a stand-alone state tax return, though KP alleges that House Bill 272 may, in the future, require it to file a consolidated state tax return. Historically, for purposes of establishing KP's rates, in effect, a hypothetical stand-alone tax return for both state and federal taxes is calculated, and the resulting tax is the tax included in the rates charged to Kentucky rate payers. The record discloses that this method is advantageous to KP, and, accordingly, KP approves of the method. This stand-alone method is, in effect, the method the Commission used in calculating the tax gross-up factor in the present case, including the tax effects of Section 199 and House Bill 272.

*SECTION 199*

Section 199 did not result in a lowering of the corporate tax rate. Rather, the section created a special income tax deduction for "domestic manufacturers." Income tax deductions, of course, result in a lower taxable income and, consequently, a lower tax liability. Therefore, if the normal method of computing KP's tax recovery is utilized—the stand-alone entity method—the inclusion of the Section 199 deduction will result in a lower hypothetical tax liability and, it follows, a lower revenue requirement than if the tax deduction is not included.

KP argues, however, that the Commission's recognition of the deduction is flawed based upon two factors: (1) KP is not a stand-alone company; it therefore does not separately compute its Section 199 benefit; and it may not receive any benefit at all, and (2) the actual effect of Section 199 on the level of tax expense cannot be accurately projected until the consolidated return is prepared and the Section 199 deduction is allocated to each member.

At this point our standard of review bears repeating: pursuant to the provisions of KRS 278.430, a party seeking to set aside a determination of the Commission bears the burden of proof to show by clear and satisfactory evidence that the Commission's determination is unreasonable or unlawful.

Here the Commission is applying the method it has used historically—the stand-alone entity method—which, it appears, KP is in overall agreement with. Use of that method will, no doubt, have its ups and downs for the utility. However, a new federal tax deduction has been passed into law which the Commission reasonably recognized in calculating KP's allowable tax expense. Simply put, recognizing that deduction was neither unreasonable nor unlawful.

*HOUSE BILL 272*

House Bill 272 reduced the Kentucky corporate income tax rate applicable to KP from 8.25% to 7% in 2005 and 2006, and then to 6% in 2007. In calculating the tax gross-up factor, the Commission recognized the change.

KP argues, however, that the Commission unfairly took into account only the change in the tax rate without also consid-

ering other provisions of the House Bill. Specifically, KP states that "[i]nstead of filing as a single corporate taxpayer, using a separate income tax return, HB 272 could be construed to require Kentucky Power to file a consolidated Kentucky income return with its parent (AEP) and sister companies. If this were to occur, the amount of Kentucky income tax will be calculated and paid on a consolidated return basis—so the state income tax expense would never be the same as that which would have been owed had Kentucky Power filed a separate return."

Hence, again, KP is against this method because recognizing its allocated share from the consolidated return may mean more in taxes recoverable through its rates than if the tax liability is computed under the stand-alone method. Because we believe the circuit court succinctly addressed the problem with KP's argument, we adopt the following from its discussion of the tax issues:

> The [Commission's] methodology is greatly beneficial to Kentucky Power because its stand-alone calculation is greater than its actual share of the AEP-consolidated tax calculation, and the [Commission] allows Kentucky Power to set rates based on the stand-alone taxes rather that the lower consolidated taxes.
>
> Against this backdrop, Kentucky Power argues that the [Commission] should not reflect the new IRS 199 deductions [and House Bill 272 rate reduction], which reduce federal and state taxes on a stand-alone basis, because AEP is not able to fully utilize these deductions to calculate its consolidated taxes or Kentucky Power's share thereof. In other words, Kentucky Power argues that it should be reimbursed by ratepayers for

the higher level of hypothetical taxes payable under the stand-alone methodology, but the tax deductions [and rate reductions] available under that methodology should be ignored and should not be factored into the calculation of its stand-alone taxes.

> The Court finds that if Kentucky Power wants the [Commission] to continue to allow rate recovery for taxes based on the stand-alone methodology, and Kentucky Power has made it very clear that it does, it must accept any and all tax deductions [and rate reductions] available on a stand-alone basis. Kentucky Power has made no argument that the IRS 199 and corresponding state deductions [and House Bill 272 tax rate reductions] would not be available to Kentucky Power if it did file an individual tax return. Because the stand-alone methodology calculates a utility's tax burden based on what the utility would pay if it did file an individual tax return, the Court finds that the decision of the [Commission] to reflect the IRS 199 and corresponding state tax deductions [and House Bill 272 rate change] in Kentucky Power's environmental surcharge gross-up factor is neither unlawful or unreasonable.

## CONCLUSION

For the foregoing reasons the judgment of the Franklin Circuit Court is affirmed.

ALL CONCUR.