BOLIN, Justice.
On December 3, 2003, the Southern Public Communication Association (“SPCA”) filed a complaint against Bell-South Telecommunications, Inc. (“Bell-South”), with the Alabama Public Service Commission (“APSC”), alleging that Bell-South’s intrastate tariffs for pay-telephone access-service rates failed to comply with § 276 of the Federal Telecommunications Act of 1996, 47 U.S.C. § 151 et seq., and certain orders of the Federal Communications Commission (“FCC”) implementing § 276. The SPCA sought for its members a refund of (1) all amounts paid for subscriber line charges between April 15, 1997, and October 1, 2003, and (2) pay-telephone access-service rates paid to Bell-South between April 15, 1997, and October 1, 2003.
BellSouth responded to the SPCA’s complaint by filing both a motion to dismiss and an answer. BellSouth argued in the motion to dismiss that the filed-rated doctrine and the prohibition against retroactive rate-making barred the SPCA’s complaint because the APSC order approving the pay-telephone access-service rates had not been challenged on appeal and, therefore, the rates approved by the APSC constituted the only lawful rates that could be charged and collected. Bell-South subsequently answered the complaint, denying the substantive allegations and asserting certain affirmative defenses, including: (1) that the complaint failed to state a claim upon which relief could be granted; (2) that the SPCA lacked standing to bring the action; (3) that certain discounts and incentive rewards were due to be set off; and (4) that the SPCA’s action was barred by the applicable statute of limitations, laches, and/or estoppel.
On April 6, 2004, an administrative law judge recommended to the APSC that BellSouth’s motion to dismiss be granted. On April 13, 2004, the APSC entered an order granting BellSouth’s motion and dismissing the complaint filed by the SPCA. On May 11, 2004, the SPCA petitioned the APSC for reconsideration and rehearing of its order. On July 15, 2004, the APSC granted the SPCA’s petition for reconsideration and rehearing.
An evidentiary hearing was held before an administrative law judge on November 17, 2004. On May 3, 2005, the administrative law judge recommended the denial of refunds and the dismissal of the SPCA’s complaint. On June 14, 2005, the APSC entered an order directing BellSouth to refund to the SPCA members $26.76 per month per line (representing the difference between the line rate of $42.25 per month imposed effective April 15, 1997, and the monthly line rate of $15.49 effec *1081 tive October 1, 2003), plus $7.13 per month per line (representing the subscriber line charges), for a total of $33.89 per month per line, plus interest at 7% from April 15, 1997, through October 1, 2003.[1] BellSouth appeals the order of the APSC to this Court, pursuant to § 37-1-140, Ala.Code 1975.

Factual Background

The SPCA is a nonprofit trade association whose members include independent pay-telephone service providers in Alabama, Mississippi, and Louisiana. The SPCA serves as an advocate for pay-telephone service providers in this state. Its members own and operate approximately 5,000 public telephones installed throughout Alabama. BellSouth is a Regional Bell Operating Company and an incumbent local exchange carrier that provides pay-telephone access services, the mechanism by which pay-telephone service providers’ telephones connect to the public switched-telephone network. Many SPCA members were customers of BellSouth that purchased pay-telephone access services from BellSouth between April 15, 1997, and October 1, 2003. Historically, Bell-South has itself also provided pay-telephone services in Alabama in competition with other pay-telephone service providers, including SPCA members. Thus, SPCA members are both competitors and customers of BellSouth.
In 1996, Congress passed the Federal Telecommunications Act of 1996 (“the Act”). Generally, the purpose of the Act was to stimulate competitiveness within the telecommunications markets. Section 276 of the Act specifically addressed the pay-telephone industry and substantially modified the regulatory scheme of that industry. In re Implementation of the Pay Telephone Reclassification & Compensation Provisions of the Telecommunications Act of 1996, Report and Order, FCC 96-388, 11 F.C.C.R. 20,541, ¶58 (September 20,1996) (“First Payphone Order”). Section 276 of the Act was intended “to promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public.” 47 U.S.C. § 276(b)(1). Section 276 of the Act prohibited Regional Bell Operating Companies from: (1) subsidizing their payphone services directly or indirectly from their telephone-exchange service operations or their exchange access operations, and (2) preferring or discriminating in favor of their pay-phone services. 47 U.S.C. § 276(a)(1) and (2). The Act expressly directed the FCC to issue regulations implementing the provisions of § 276. Section 276(c) of the Act also provides that “[t]o the extent that any State requirements are inconsistent with the [FCC’s] regulations, the [FCC’s] regulations on such matters shall preempt such State requirements.” 47 U.S.C. § 276(c).
Pursuant to its express authority to implement regulations, the FCC issued a series of orders commonly referred to as “payphone orders.” The FCC directed that local-exchange carriers, such as Bell-South, charge pay-telephone service pro *1082 viders for intrastate pay-telephone access services in accordance with the FCC’s “new services test.” “The new services test requires that rates for those telecommunications services to which it applies be based on the actual cost of providing the service, plus a reasonable amount of the service provider’s overhead costs.” Davel Commc’ns, Inc. v. Qwest Corp., 460 F.3d 1075, 1081 (9th Cir.2006). The rates charged for the pay-telephone access services had to be (1) cost based; (2) consistent with the requirements of § 276, for example, the removal of subsidies from exchange access services; and (3) nondiscriminatory. The FCC required that the new tariffs be filed with the state utility commissions for approval no later than January 15, 1997, with an effective date of April 15, 1997. First Payphone Order; In re Implementation of the Pay Telephone Reclassification & Compensation Provisions of the Telecommunications Act of 1996, Order on Reconsideration, FCC 96-439, 11 F.C.C.R. 21,233, ¶ 163 (November 8, 1996) (“Order on Reconsideration”) (collectively “Payphone Orders”).
On April 10, 1997, a coalition of Regional Bell Operating Companies, including Bell-South, requested from the FCC an extension of the time in which to file intrastate pay-telephone access-service rates that were compliant with the new services test. The coalition requested a 45-day extension of the deadline from April 4, 1997. In exchange for the FCC’s extending the deadline within which to file intrastate pay-telephone access-service rates that were compliant with the new services test, the coalition member companies voluntarily committed to reimburse or provide a credit back to April 15, 1997, for those customers purchasing intrastate pay-telephone access services, if the new rates were lower than the previous noncompliant rates. The FCC, on April 15, 1997, issued an order granting the limited waiver, stating the following:
“[W]e grant all LECs [local exchange carriers] a limited waiver until May 19, 1997 to file intrastate tariffs for payphone services consistent with the guidelines established in the Order on Reconsideration, subject to the terms discussed herein. This waiver enables LECs to file intrastate tariffs consistent with the ‘new services’ test of the federal guidelines required by the Order on Reconsideration and the Bureau Waiver Order, including cost support data, within 45 days of the April 4, 1997, release date of the Bureau Waiver Order and remain eligible to receive payphone compensation as of April 15, 1997, as long as they are in compliance with all of the other requirements set forth in the Order on Reconsideration. Under the terms of this limited waiver, a LEC must have in place intrastate tariffs for payphone services that are effective by April 15, 1997. The existing intrastate tariffs for payphone services will continue in effect until the intrastate tariffs filed pursuant to the Order on Reconsideration and this Order become effective. A LEC who seeks to rely on the waiver granted in the instant Order must reimburse its customers or provide credit from April 15, 1997, in situations where the newly tariffed rates, when effective, are lower than the existing tariffed rates. This Order does not waive any of the other requirements with which the LECs must comply before receiving compensation.”
In re Implementation of the Pay Telephone Reclassification & Compensation Provisions of the Telecommunications Act of 1996, Order, DA 97-805, 12 F.C.C.R 21,370, ¶ 25 (April 15, 1997) (“the Waiver Order”). The coalition member companies were to file their new-services-test-eompli-ant rates and cost-support data with the *1083 state utility commissions, which were required to act on the new rates within a reasonable time. Id. ¶¶ 18,19 n. 60.
On May 19,1997, BellSouth submitted to the APSC its proposed intrastate pay-telephone access-service rate of $42.25 per line per month. BellSouth also submitted in support of its proposed rate a two-page summary of its cost-support data. Following a hearing, the APSC entered an order on October 10, 1997, approving BellSouth’s filed rate, stating:
“It appears from the record in this proceeding, and we find ... that the proposed rates are in compliance with federal guidelines, are just and reasonable and nondiscriminatory, and recover a reasonable portion of overhead costs; and that the proposed rates do not subsidize the pay phones of [BellSouth’s] sister company.”[2]
This order was not appealed.
Confusion ensued following the issuance of the Payphone Orders and the Waiver Order by the FCC, which resulted in the disparate application of the new services test in various state proceedings. In response, the FCC, on January 31, 2002, issued an order clarifying the requirements of the new services test in an effort to assist the state public service commissions in applying the new services test to ensure compliance with the Payphone Orders and § 276 of the Act. In re Wisconsin Public Service Commission Order Directing Filings, Memorandum Opinion and Order, FCC 02-25, 17 F.C.C.R. 2051, ¶2 (2002) (“the Wisconsin Order”), affirmed, New England Pub. Commc’ns Council, Inc. v. FCC, 334 F.3d 69 (D.C.Cir.2003). Initially, the FCC reiterated that intrastate pay-telephone access-service rates must comply with the flexible cost-based new services test; i.e., the proposed rate must not recover more than the direct costs of the service, plus a “just and reasonable overhead portion of the carrier’s overhead costs.” Wisconsin Order, ¶¶23, 42, 68. Second, the FCC stated that the rates should be calculated using a forward-looking, cost-based methodology. Wisconsin Order, ¶¶ 49, 68. For example, “the rates must take into account only the ongoing costs of providing the service, and may not recover previously incurred costs, such as those incurred in building the telephone system infrastructure.” Davel Commc’ns, 460 F.3d at 1083. Third, the FCC ordered that overhead-loading rates for the pay-telephone lines should be cost-based and may not be set artificially high in order to subsidize other local exchange-carrier services. Wisconsin Order, ¶¶51, 68. Finally, the FCC directed that in establishing its cost-based intrastate pay-telephone access-service rate, the Regional Bell Operating Companies “must reduce the monthly per line charge determined under the new services test by the amount of the applicable federal tariffed [subscriber line charge].” Wisconsin Order, 1161.
The SPCA, on December 3, 2003, filed its complaint against BellSouth, alleging violations of § 276 of the Act and the Payphone Orders and seeking a refund of alleged overcharges to its members of in *1084 trastate pay-telephone access-service rates. The SPCA presented evidence during the hearing before the APSC indicating that BellSouth’s intrastate pay-telephone access-service rates effective during the period April 15, 1997, through October 1, 2003, exceeded a level that could be considered compliant with § 276 of the Act and the Payphone Orders; that the cost-study information provided by BellSouth to the APSC during the 1997 pay-telephone tariff proceeding failed to address any of BellSouth’s overhead costs for the pay-telephone access services; that the cost-support data contained nothing to support the level of overhead loading present in the rate; that BellSouth’s 1997 rate was determined by adding 100% of its direct costs; and that because the cost study failed to address overhead-loading costs, BellSouth’s presentation of its pay-telephone access-service rates to the APSC in 1997 was flawed and BellSouth could not have satisfied the standard that existed at the time.
BellSouth presented evidence indicating that the cost-support data it filed with the APSC in 1997 complied with all state and federal requirements that affected pay-telephone access-service rates at the time; that it was not until the Wisconsin Order was issued that the FCC, in 2003, prescribed a specific methodology for completing cost-support studies relating to pay-telephone access-service rates; that the APSC concluded in 1997, after reviewing the cost-support data submitted by BellSouth in support of its proposed rates, that the proposed rates complied with federal guidelines; and that the Wisconsin Order did not permit the retroactive changing of a pay-telephone access-service rate that had been filed and approved.

The Standard of Review

This Court has stated:
“Appellate review of orders of the APSC, both by a circuit court and by the Supreme Court of Alabama, is governed by § 37-1-124, Ala.Code 1975. Alabama Public Service Commission v. Redwing Carriers, Inc., 366 So.2d 1111 (Ala.1979). Section 37-1-124 provides, in pertinent part:
“ ‘The commission’s order shall be taken as prima facie just and reasonable. No new or additional evidence may be introduced in the circuit court, except as to fraud or misconduct of some person engaged in the administration of this title and affecting the order, ruling or award appealed from, but the court shall otherwise hear the case upon the certified record and shall set aside the order if the court finds that:
“ ‘(1) The commission erred to the prejudice of appellant’s substantial rights in its application of the law; or
“ ‘(2) The order, decision or award was procured by fraud or was based upon a finding of facts contrary to the substantial weight of the evidence.’
“This Court has written:
‘“Where the evidence is heard ore tenus by a Hearing Examiner, the presumption of correctness normally accorded the Alabama Public Service Commission’s order will be accorded to the Examiner’s findings of fact; and, if it adopts the Hearing Examiner’s findings of fact, the APSC’s order is entitled to the same presumption. Southern Haulers, Inc. v. APSC, 331 So.2d 660 (Ala.1976).’
“Alabama Public Service Commission v. Redwing Carriers, Inc., 366 So.2d 1111, 1112 (Ala.1979).”
Vulcan Freight Lines, Inc. v.K&B Hauling Co., 621 So.2d 248, 249 (Ala.1993).

*1085
Analysis

BellSouth argues that the APSC was without the statutory authority to order the refund in this ease and, further, that its order violates the “filed-rate doctrine” and the prohibition against retroactive rate-making. Alabama has an elaborate administrative scheme to ensure that rates charged for utilities are just and reasonable for the affected utilities as well as for the public. See § 37-1-1 et seq., Ala.Code 1975. The legislature has delegated to the APSC the responsibility for determining utility rates and what constitutes a fair rate of return. Alabama Power Co. v. Alabama Pub. Serv. Comm’n, 422 So.2d 767, 769 (Ala.1982). The APSC is a statutory creature and, as such, can assume and exercise only those powers clearly granted to it by the legislature. Alabama Great Southern R.R. v. Alabama Pub. Serv. Comm’n, 210 Ala. 151, 97 So. 226 (1923). Section 37-1-81, Ala.Code 1975, sets forth the legislatively mandated procedures to be followed when a utility seeks to replace an existing rate. Section 37-1-81 provides:
“(a) Whenever a utility desires to put in operation a new rate or service regulation or to change any existing rate or service regulation, it shall file with the commission a new schedule embodying the same, not less than 30 days prior to the time it desires to make the same effective; but the commission may, upon application of the utility, prescribe a less time within which the same may be made effective. In the absence of suspension or disapproval by the commission, as herein provided, the new rate or service regulation embodied in any such new schedule shall become effective at the time specified in such schedule, subject however to the power of the commission at any time thereafter to take any action respecting the same authorized by this title.
“(b) To enable it to make such investigation as, in its opinion, the public interest requires, the commission, in its discretion, for a period not exceeding six months may suspend the operation of any new schedule of rates or service regulations filed with the commission. Unless as a result of its investigation the commission otherwise orders before the termination of such period of six months, such rate or service regulation shall thereupon become effective. The commission may make any order in the premises which it is authorized by any of the provisions of this title to make in any investigation or complaint or on its own motion without complaint.”
In addition to granting the APSC the authority to approve new rates, the legislature has also granted the APSC, under carefully prescribed authority, the power to investigate and modify or amend existing rates found to be unreasonable. Section 37-1-83, Ala.Code 1975, provides:
“Upon a complaint in writing made against any utility by any mercantile, agricultural or manufacturing society, or by any body politic or municipal organization, or by any affected person, that any rate, service regulation, classification, practice or service in effect or proposed to be made effective is in any respect unfair, unreasonable, unjust or inadequate, or unjustly discriminatory, or unduly preferential, or constitutes unfair competition, or that the service is inadequate or cannot be obtained, the commission shall proceed, and without such complaint, the commission, whenever it deems that the public interest so requires, may proceed, after notice as provided in this division, to make such investigation as it may deem necessary or appropriate; but no order affecting such rates, service regulation, classification, practice, or service complained of shall be entered by the commission with *1086 out notice and a hearing. Any utility may make complaint as to any matter within the provisions of this title with like effect as though made by any mercantile, agricultural or manufacturing society, body politic or municipal organization, or other person. However, when any such complaint in writing is filed, the same shall be set down for hearing within 90 days from the date of the filing thereof, which said hearing may be continued for an additional period not to exceed 90 days, unless the parties to said proceeding agree upon further continuance.”
Section 37-1-97, Ala.Code 1975, provides:
“Whenever, upon an investigation made under the provisions of this title, the commission shall find any existing rate or rates or any regulation or practice whatsoever or any service, unreasonable or unjustly discriminatory, or any service inadequate, it shall so determine and by order fix, to the extent that it is within its power to do so, a reasonable rate, fare, charge, classification or joint rate as between like carriers, to be imposed, observed and followed in the future in lieu of that found to be unreasonable or unjustly discriminatory, or inadequate, as the case may be. All utilities to which the order applies shall make such changes in their schedule of rates, fares, charges or classifications as may be necessary to make the same conform to said order, where such order relates to rates, fares, charges or classification, and no change shall thereafter be made by any utility in such rates, fares, charges or classification, or joint rate or rates, or in the service or practice so ordered, without the approval of the commission.”
(Emphasis added.) Rates established by the APSC are deemed prima facie reasonable. § 37-1-99, Ala.Code 1975.
“The filed-rate doctrine provides that once a filed rate is approved by the appropriate governing regulatory agency, it is per se reasonable and is unassailable in judicial proceedings.” Birmingham Hockey Club, Inc. v. National Council on Compensation Ins., Inc., 827 So.2d 73, 78 n. 4 (Ala.2002). “The filed rate doctrine provides that where a regulated company has a rate for service on file with the applicable regulatory agency, the filed rate is the only rate that may be charged.” Florida Mun. Power Agency v. Florida Power & Light Co., 64 F.3d 614, 615 (11th Cir.1995). This Court has stated:
“The filed-rate doctrine ‘is designed to insulate from challenge the filed rate deemed reasonable by [a] regulatory agency.’ Allen v. State Farm Fire & Cas. Co., 59 F.Supp.2d 1217, 1227 (S.D.Ala.1999) (citing Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17 (2d Cir. 1994)). The filed-rate doctrine recognizes that when the legislature has established a scheme for rate-making, the rights of the ratepayer in regard to the rate he pays are defined by that scheme. Taffet v. Southern Co., 967 F.2d 1483 (11th Cir.1992).”
Peachtree Cas. Ins. Co. v. Sharpton, 768 So.2d 368, 372 (Ala.2000).
The principles of the filed-rate doctrine are embodied in our statutory rate-making scheme and have been recognized in our caselaw. In T.R. Miller Mill Co. v. Louisville & N.R.R., 207 Ala. 253, 92 So. 797 (1921), the plaintiff mill sought to recover from the railroad excessive freight charges. The mill contended that the approved tariff of the railroad was inconsistent with a previous notice to the carrier about the proper rates to be charged and an order of the commission holding the rate to be unreasonable. This Court held that the rate charged by the railroad had been filed and approved and, therefore, *1087 was the lawful rate, whether reasonable or not, and constituted the only rate that could legally be charged by the railroad. 207 Ala. at 257, 92 So. at 801. The Court further concluded that the mill was not entitled to recover any excess charges on the shipments, stating:
“[E]ven if it were conceded that the Commission intended its order to be retroactive, it is clear that our statutes give the Commission no such power. Section 5678 [now § 37-1-97] provides that, whenever, upon an investigation made under the provisions ... of the Code, the Commission shall find any existing rate or rates unreasonable or unjustly discriminatory—
“ ‘it shall so determine, and by order fix a reasonable rate, ... to be imposed, observed, and followed in the future in lieu of that found to be unreasonable, or unjustly discriminatory.’”
207 Ala. at 258, 92 So. at 801-02. See also State v. Alabama Pub. Serv. Comm’n, 293 Ala. 553, 307 So.2d 521 (1975) (holding that neither this Court nor a trial court is empowered to order a refund of amounts collected by a telephone company in accordance with a schedule of rates prescribed by the Public Service Commission that are later disapproved by a court); Foshee v. General Tel. Co. of Southeast, 295 Ala. 70, 322 So.2d 715 (1975)(holding that because there can be only one lawful rate charged by a telephone company, the telephone company could charge and collect only that rate that was established by the Public Service Commission, and the telephone company was under no legal or equitable obligation to refund any moneys to subscribers). In Taffet v. Southern Co., 967 F.2d 1483 (11th Cir.1992), a group of utility customers brought a RICO action against utility companies, alleging that the companies had obtained approval of their rates from the state rate-making commissions through fraud. The United States Court of Appeals for the Eleventh Circuit held that the filed-rate doctrine precluded the customers of the utility companies from suffering a legally cognizable injury sufficient to predicate a RICO civil action based on a claim that the utility companies had obtained approval of an excessive rate from the state rate-making commissions through fraud, because, under the filed-rate doctrine, the customers had no right to be charged a lower rate than they were actually charged. Id. In discussing Alabama’s rate-making scheme, the court stated:
“[UJnder Alabama law, a PSC cannot declare retrospectively that a rate it previously approved was unreasonable and, therefore, unlawful. See Ala.Code § 37-1-97; T.R. Miller Mill Co. v. Louisville & Nashville R.R. Co., 207 Ala. 253, 92 So. 797, 801 (1921). Also, even if the PSC or a court declares that a previously approved rate was excessive, it may not order the utility to refund the excess to consumers. See, e.g., Foshee v. General Tel. Co., 295 Ala. 70, 322 So.2d 715, 717 (1975); State v. Alabama Pub. Serv. Comm’n, 293 Ala. 553, 307 So.2d 521, 539 (1975). Alabama law, however, directs the PSC to set prospective rates that are ‘reasonable and just to both the utility and the public. ’ Ala. Code § 37-1-80 (Supp.1991) (emphasis added). Rate-payers, as persons affected by an excessive rate obtained by fraud, may file a complaint with the PSC, id. § 37-1-83; if the PSC, upon investigation of the complaint, determines that the rate is indeed excessive or unfair, it must set a reasonable rate— one that is fair to both public and utility — to be followed in the future, id. § 37-1-97.”
Taffet, 967 F.2d at 1492 (final emphasis added).
*1088 In October 1997, the APSC entered an order approving BellSouth’s filed pay-telephone access-service rate, and that rate constituted the only legal rate that could have been charged by BellSouth. That rate remained in full effect until a new rate was established on October 1, 2003. Pursuant to our statutes and case-law, the rate established in October 1997 could be lawfully altered only prospectively. The APSC could not retrospectively declare that the rate it had previously approved in 1997 was excessive, and, more importantly, it could not order a refund of those excess charges. Taffet, supra; Foshee, supra; T.R. Miller Mill, supra. Accordingly, we conclude that the APSC was without the authority to direct Bell-South to refund to the SPCA members purportedly excess pay-telephone access-service rates charged between April 15, 1997, and October 1, 2003.
Relying on what is known as the “Kellogg Letter” and the Waiver Order, the SPCA contends that BellSouth has waived any possible application of the fíled-rate doctrine or the prohibition against retroactive rate-making. As discussed above, BellSouth, as a member of the coalition of Regional Bell Operating Companies, requested an extension from the FCC to file rates compliant with the new services test. In exchange for the extension, BellSouth voluntarily committed to provide a refund to its customers for rates charged back to April 15, 1997, in situations where the new-services-test-compliant rates were lower than existing noncompliant rates. Michael Kellogg, counsel for the coalition, in a letter to the FCC dated April 10, 1997, requesting the extension (the “Kellogg Letter”), expressly stated:
“Once the new state tariffs go into effect, to the extent that the new tariff rates are lower than the existing ones, we will undertake to reimburse or provide a credit to those purchasing the services back to April 15, 1997. (I should note that the filed-rate doctrine precludes either the state or federal government from ordering such a retroactive rate adjustment. However, we can and do voluntarily undertake to provide one, consistent with state regulatory requirements, in this unique circumstance. Moreover, we will not seek additional reimbursement to the extent that tariff rates are raised as a result of applying the ‘new services’ test.)”
The FCC in the Waiver Order granted the coalition the extension in which to file new-services-test-compliant rates, stating: “A LEC [local exchange carrier] who seeks to rely on the waiver granted in the instant Order must reimburse its customers or provide credit from April 15,1997, in situations where the newly tariffed rates, when effective, are lower than the existing tar-iffed rates.” Waiver Order ¶ 25.
The SPCA gives too much effect to the Kellogg Letter and the Waiver Order. The Kellogg Letter and the Waiver Order simply reflect that BellSouth and the FCC had agreed that in exchange for an extension of the tariff-filing deadline, BellSouth would ensure that pay-telephone providers would be placed in the same position as they would have been had the tariffs been filed on April 15, 1997, rather than on May 19, 1997. Any reimbursement or credit was “to the extent that the new tariff rates were lower than the existing ones.” Kellogg Letter. The waiver, therefore, operated only for the period from April 15, 1997, until October 10, 1997, when- the rates were set by the APSC’s order approving BellSouth’s tariffs, effective April 15, 1997. Because the tariffed rates became effective April 15,1997, there was no rate differential after April 15, 1997, to be refunded or credited. Had there been, the *1089 refund or credit would have been limited to any excess between the tariffed rates existing before the October 10, 1997, order and the tariffed rates established by that order.
If the filed-rate doctrine or the prohibition against retroactive rate-making was waived at all, the waiver was effective only until the entry of the tariffed rates approved by the APSC on October 10, 1997, effective April 15, 1997. There was no waiver here of the filed-rate doctrine nor of the prohibition against retroactive rate-making beyond the October 10,1997, order of the APSC.
The SPCA argues that § 276 of the Act preempts state law, specifically the filed-rate and retroactive-rate-making doctrines. On the contrary, the orders of the FCC establish that it was going to rely on the existing state regulatory schemes in order to comply with the mandates of § 276. Order on Reconsideration ¶ 163. As discussed above, the filed-rate and retroactive-rate-making doctrines are embodied in Alabama’s statutory rate-making scheme. Additionally, Kentucky, a state with a similar regulatory scheme has addressed the issue of preemption in the context of § 276 of the Act and the FCC orders — The First Payphone Order, the Order on Reconsideration, the Wisconsin Order, and the Waiver Order — stating:
“[W]e are not convinced that the FCC’s holdings in the Wisconsin Order were intended to pre-empt our state regulatory requirements in any way. The FCC recognized that the federal restructuring of telecommunications regulation was sweeping and that market changes contemplated by the legislation would require a period of transition. Although Congress had authorized it to pre-empt conflicting state regulations, the FCC expressed a strong interest in maintaining federal-state comity. It chose to rely on the state regulatory mechanisms already in place to effect the desired changes — specifically with respect to rate setting proceedings. The Wisconsin Order did no more than to direct state agencies to implement the refined requirements of the new services test in accordance with their own statutory schemes.
“We are reinforced in our opinion by the unique system devised by Congress and reflected in the Act that requires the cooperation of federal and state regulators in the so-called ‘new federalism’ without resort to pre-emptive measures.”
Cincinnati Bell Telephone Co. v. Kentucky Pub. Serv. Comm’n, 223 S.W.3d 829, 839-40 (Ky.Ct.App.2007). Accordingly, we conclude that § 276 of the Act and the FCC orders do not preempt the state regulatory scheme specifically relied on by the FCC to implement the mandates of the Act, including the principles of the filed-rate and the retroactive-rate-making doctrines embodied in our regulatory scheme.
Because the APSC was without authority to order a refund to the SPCA in this case, we must reverse the order of the APSC and remand this case for further proceedings consistent with this opinion. We pretermit discussion of the remaining issues raised by BellSouth.
REVERSED AND REMANDED.
SEE, LYONS, WOODALL, STUART, SMITH, PARKER, and MURDOCK, JJ., concur.
COBB, C.J., recuses herself.

. On July 12, 2005, BellSouth moved the APSC to modify its order asserting that the APSC had made a mathematical error in calculating the total refund because the calculated refund of $26.76 already included recovery of the $7.13 subscriber line charge. It does not appear from the record that this motion was ruled on. However, the SPCA concedes on appeal that the APSC’s order calculating the refund as $26.76 plus the $7.13 subscriber line charge represents a double recovery for its members. Specifically, the SPCA agrees that the refund amount of $26.76 includes the $7.13 subscriber line charge. Therefore, the SPCA asks only that the order of the APSC be affirmed to the extent it awarded a refund of $26.76 per line per month, plus 7% interest, from April 15, 1997, through October 1, 2003.

. As mentioned above, BellSouth filed a two-page summary of its cost-support data at the time it filed its proposed rate. Summaries of cost-support data had not been permitted since 1991. See In re Wisconsin Public Service Commission Order Directing Filings, Order, DA 00-347, 15 F.C.C.R. 9,978, ¶7 n. 16 (March 2, 2000). The APSC noted in its order that BellSouth had not filed the cost-support data. By letter dated September 23, 1997, the APSC requested the appropriate cost-support data from BellSouth. BellSouth filed the cost-support data with the APSC on October 6, 1997, four days before the APSC entered its order. Alleged deficiencies in the cost-support data filed by BellSouth are discussed later in this opinion.